Sarah R. Gonski (Bar No. 032567)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone:  602.351.8000
Facsimile:   602.648.7000
SGonski@perkinscoie.com
DocketPHX@perkinscoie.com

Marc E. Elias*
John Devaney*
Amanda R. Callais*
K'Shaani O. Smith**
Christina A. Ford**
**PERKINS COIE LLP**
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone:  202.654.6200
Facsimile:   202.654.6211
melias@perkinscoie.com
jdevaney@perkinscoie.com
acallais@perkinscoie.com
kshaanismith@perkinscoie.com
christinaford@perkinscoie.com

*Admitted Pro hac vice*
**Pro hac vice application to be filed*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Voto Latino, Inc. and Priorities USA,<br><br>                    Plaintiffs,<br><br>          v.<br><br>Katie Hobbs, in her official capacity as Arizona Secretary of State,<br><br>                    Defendant. | No. 2:19-cv-05685-PHX-DWL<br><br>**NOTICE OF FILING FIRST AMENDED COMPLAINT** |

          Plaintiffs hereby give notice of filing a First Amended Complaint, attached to this notice as required by Local Rule 15.1(b).

1

Dated: December 2, 2019

**PERKINS COIE LLP**

2

3

By:   s/ Sarah R. Gonski
         Sarah R. Gonski (# 032567)
         2901 N. Central Avenue, Suite 2000
         Phoenix, Arizona 85012-2788

4

5

Marc E. Elias*
John Devaney*

6

Amanda R. Callais*
K'Shaani O. Smith**

7

Christina A. Ford**

8

**PERKINS COIE LLP**
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960

9

10

*Admitted Pro hac vice*
**Pro hac vice application to be filed*

11

*Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that on December 2, 2019, I electronically transmitted the attached

3  document to the Clerk's Office using the CM/ECF System for filing.

4

5                            s/ Sarah R. Gonski

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sarah R. Gonski (Bar No. 032567)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone:  602.351.8000
Facsimile:   602.648.7000
SGonski@perkinscoie.com
DocketPHX@perkinscoie.com

Marc E. Elias*
John Devaney*
Amanda R. Callais*
K'Shaani O. Smith**
Christina A. Ford**
**PERKINS COIE LLP**
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone:  202.654.6200
Facsimile:   202.654.6211
melias@perkinscoie.com
jdevaney@perkinscoie.com
acallais@perkinscoie.com
kshaanismith@perkinscoie.com
christinaford@perkinscoie.com

*Admitted Pro hac vice
**Pro hac vice application to be filed*

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Voto Latino, Inc. and Priorities USA,<br><br>                              Plaintiffs,<br><br>               v.<br><br>Katie Hobbs, in her official capacity as Arizona Secretary of State,<br><br>                              Defendant. | No. 2:19-cv-05685-PHX-DWL<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs Voto Latino, Inc. and Priorities USA, through the undersigned attorneys, file this Amended Complaint for Declaratory and Injunctive Relief against Katie Hobbs, in her official capacity as the Arizona Secretary of State ("Secretary"), and upon information and belief allege as follows:

## NATURE OF THE CASE

1.      During the 2016 presidential preference election, 72,304 Arizonans cast their ballot for Marco Rubio to become the Republican presidential candidate—even though Rubio had withdrawn from the race several days prior to the election. Why did so many Arizonans waste their vote on a ghost candidate? Because they were among the nearly 80% of Arizonans who vote by mail, and Arizona's law requiring that mail-in ballots be received by 7:00 p.m. on Election Day—not postmarked—means that voters must cast and mail their ballots well in advance of Election Day to be considered timely. A.R.S. § 16-548(A). By the time voters heard of the critical information, their votes had already been cast.

2.      Voters in that election were by no means the only voters negatively impacted by Arizona's deadline. Election after election, thousands of otherwise eager voters are caught unaware by the fact that Arizona requires ballots to be received by 7 p.m. on Election Day ("Election Day Receipt Deadline"). A.R.S. § 16-548(A). In 2008, at least 1,611 ballots were rejected for arriving after the Election Day Receipt Deadline, even though many of them were mailed multiple days before election day. That number is steadily increasing. In 2012, more than double that number—4,107 ballots—were rejected. And in the 2018 midterm election, a lower turnout election than either the 2008 and 2012 general election, at least 4more than 2,500 ballots were rejected in Maricopa and Navajo Counties alone because they arrived after the Election Day Receipt Deadline. A disproportionate number of these ballots were cast by Arizona's Hispanic and other minority voters.

3.      It is not surprising that such a large number of ballots arrive after Arizona's Election Day Receipt Deadline; A.R.S. § 16-548(A) effectively creates a second, little-known shadow deadline, the "Pre-Election Cutoff." Arizona's election officials define the Pre-Election Cutoff in various ways, but all appear to agree that a ballot must be mailed at

least five full days in advance of the election—and sometimes six or seven days—to have a reasonable certainty that it will arrive in time to be counted. If the ballot is received after 7 p.m. on Election Day, the ballot is discarded. Even if the ballot was postmarked well in advance of Election Day, including before or during the five to seven recommended days, but failed to arrive because of mail irregularities, the ballot is rejected.

4.      As a result, Arizona's Election Day Receipt Deadline, and the corresponding Pre-Election Cutoff it necessitates, confuses voters and confounds their reasonable expectations. In nearly all other mail-related deadlines in modern life, mail is considered timely if it is *postmarked* by the applicable deadline. Even in Arizona, in non-election contexts such as tax and insurance payments, postmarks are used to guide deadlines for mail-related activities. Further—as illustrated above—late-breaking changes routinely alter political dynamics during the final days before an election. Voters have a reasonable expectation that they can (and should) evaluate the candidates and issues up to and including Election Day.

5.      Arizona has no legitimate interest in enforcing the Election Day Receipt Deadline, particularly where over the last decade it has pushed voters across the State to utilize mail voting. Although Arizona may certainly set a reasonable deadline to receive ballots to ensure the finality of election results, the current Election Day Receipt Deadline is unreasonable and disenfranchising: it is contrary to voters' reasonable expectations, necessitates that ballots be cast far earlier than they need to be, and is poorly communicated to voters. Moreover, it has real consequences for elections. Over the last several election cycles, multiple races in Arizona have been decided by margins of mere hundreds of votes and in some cases far less—1,500 to even 30 votes could easily make the difference in an election outcome. And allowing the State to count these votes could correspondingly save the State and counties significant amounts of money spent on costly recounts and post-election litigation.

5.6.    The State can still serve its election administration interest by accepting ballots postmarked by Election Day and received within a reasonable time—five business days, at

a minimum—thereafter. After all, Arizona need not complete its total vote count until 20 days after Election Day. A.R.S. § 16-642(A). And Arizona already contemplates that a certain number of ballots will not be countable right away; ballots that arrive in a timely but incomplete fashion are curable up to five business days after Election Day. *Id.* § 16-550. Counting ballots that have been postmarked by Election Day, as long as they are received within five business days of Election Day, at a minimum, would serve the State's interests in finality of results without unduly burdening its voters. It would also ensure that all Arizona voters have sufficient protections in place to ensure that their right to vote is not arbitrarily and repeatedly denied.

6.7. While the Election Day Receipt Deadline affects all Arizona voters, it particularly disenfranchises Arizonans in rural counties by a much greater margin.. In 2018, for example, in 2018, approximately 1,535 voters in rural Navajo County were disenfranchised 4.5 times more likely to have their mail ballot rejected for arriving after the Election Day Receipt Deadline than voters in urban Maricopa County. In contrast, 3,062 late ballotsIn rural Cochise County, that ratio jumped to 5.1, and in rural Santa Cruz County, voters were reported in Navajo County and 6,227 ballots were reported as late5.9 times more likely to have their ballot rejected for arriving after the Election Day Receipt Deadline than voters in Yuma County, both of which have a significantly smaller number of registered voters than Maricopa. County.

7.8. In rural areas, mail service is unreliable and delay-ridden. Instead of going directly from one rural address to another nearby address, local mail in rural areas is often re-routed through a central processing facility in Phoenix, which increases delivery times. As a consequence, rural voters must take particular care to mail their ballot well in advance of Election Day and are especially vulnerable to Arizona's refusal to count ballots that arrive after the Election Day Receipt Deadline.

8.9. Further, the Election Day Receipt Deadline has particularly profound implications for Arizona's Hispanic and Latino voters. Statistically, they comprise a disproportionately significant portion of voters whose ballots are rejected under the Election

Day Receipt Deadline. Indeed, in ~~rural counties~~Maricopa County, Hispanic and Latino voters are ~~five to six times more likely to be disenfranchised than white voters, and even in urban Maricopa County, they are~~ twice as likely to be disenfranchised by the Election Day Receipt Deadline than white voters. And in rural counties with high Hispanic and Latino populations such as Santa Cruz, where 83% of the population is Hispanic/Latino, ballots are 7.6 times more likely to be rejected for arriving after the Election Day Receipt Deadline.

~~9.~~10.  The reasons for this disparity are varied, but each is traceable to Arizona's long history of discrimination against minority voters and, particularly, against members of its Hispanic and Latino community. *First*, discrimination in education has led to persistent gaps that have left these minority voters less educated than their white counterparts, which makes them less likely to be aware of the Election Day Receipt Deadline. *Second*, given the lack of language assistance provided to voters—coupled with Arizona's sustained resistance to bilingual education and mandated English-only education—Hispanic and Latino voters are less likely to understand the instructions provided by county election officials regarding the Election Day Receipt Deadline, particularly when those instructions are inconsistent. *Third*, due to disparities in income, Hispanic and Latino voters experience higher rates of poverty than white voters, and have less access to reliable transportation and often less flexible work schedules, both of which make it more difficult for them to turn in a mail ballot by other means, such as in-person at the county recorder's office or a polling location by the Election Day Receipt Deadline.

~~10.~~11. Arizona's unjustified imposition of the Election Day Receipt Deadline violates the First and Fourteenth Amendments because it imposes an undue burden on voters that is not outweighed by any legitimate interest on the part of the State. Further, the Election Day Receipt Deadline strips voters of their right to procedural due process~~, and it undermines the ability of Arizona's Hispanic and Latino voters to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act.~~. For all these reasons, the Election Day Receipt Deadline should be enjoined.

**JURISDICTION AND VENUE**

11.12. Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

12.13. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

13.14. This Court has personal jurisdiction over Defendant, who is sued in her official capacity only.

14.15. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

15.16. This Court has the authority to enter a declaratory judgment and to provide permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

**PARTIES**

16.17. Plaintiff Voto Latino, Inc. is a nonprofit organization that engages, educates, and empowers Latino communities across the United States, working to ensure that Latinos are enfranchised and included in the democratic process. In furtherance of its mission, Voto Latino expends significant resources to register and mobilize thousands of Latino voters each election cycle, including the nearly 1 million eligible Latino voters in Arizona. Since 2010, Voto Latino has been mobilizing Latino voters in Arizona through statewide voter registration initiatives as well as peer-to-peer and digital voter education and get-out-the-vote campaigns. As part of Voto Latino's voter education and get-out-the-vote campaigns, the organization educates voters, among other things, on when to cast their absentee mail ballots. In 2020, Voto Latino anticipates making expenditures in the millions of dollars to educate, register, mobilize, and turn out Latino voters across the United States, including in Arizona. Arizona's Election Day Receipt Deadline directly harms Voto Latino by frustrating its mission of enfranchising and turning out Latino voters in Arizona because it burdens and disenfranchises the very voters that Voto Latino seeks to support. As a result,

Voto Latino has had to—and will continue to—expend and divert additional funds and resources that it would otherwise spend on its efforts to accomplish its mission in other states or its own registration efforts in Arizona, to turn out these voters and to combat the effects that Arizona's Election Day Receipt Deadline has on Latino voters.

17.18. Plaintiff Priorities USA ("Priorities") is a 501(c)(4) nonprofit, voter-centric progressive advocacy and service organization. Priorities' mission is to build a sustainable infrastructure to engage Americans in the progressive movement by running a permanent digital campaign to persuade and mobilize citizens around issues and elections that affect their lives. In furtherance of this purpose, Priorities works to help educate, mobilize, and turn out voters across the country, including in Arizona. In 2020, Priorities expects to make millions of dollars of contributions and expenditures to educate, mobilize, and turn out voters in state and federal elections around the country, including thousands of dollars to educate, mobilize, and turn out voters in Arizona elections. Arizona's enforcement of its Election Day Receipt Deadline for casting ballots directly harms Priorities because it burdens and disenfranchises the very voters Priorities supports through its work and contributions in Arizona. As a result, Priorities has to expend and divert additional funds and resources in GOTV, voter education efforts, mobilization, and turn-out activities in Arizona, at the expense of its voter support initiatives in other states and other voter education and turnout programs in Arizona.

18.19. Defendant Katie Hobbs is sued in her official capacity as Secretary of State for the State of Arizona (the "Secretary"). The Secretary is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law. She is the Chief Elections Officer for Arizona. A.R.S. § 16-142(A)(1). As Arizona's Chief Elections Officer, the Secretary is responsible for overseeing the voting process in Arizona and is empowered with broad authority to carry out that responsibility. The Secretary also issues the Arizona Election Procedures Manual ("Manual"), which establishes election procedures and administration across Arizona's 15 counties. A.R.S. § 16-452. The Manual is approved by the Governor and the Arizona Attorney General and carries the force of law. A.R.S. § 16-452(B). Arizona

law also requires the Secretary, after consulting with county officials, to "prescribe rules to achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating and storing ballots." A.R.S. § 16-452(A). Thus, the Secretary directs county officials, who are responsible for physically counting ballots, regarding when to count or reject ballots.

## GENERAL ALLEGATIONS

### Mail Voting in Arizona

~~19.~~20. Arizonans have a right to vote by mail. A.R.S. § 16-541(A). Over the past decade, early voting by mail has grown exponentially in Arizona. In the 2008 general election, for example, just over a million Arizona voters cast their ballot by mail. By the 2016 general election, that number had doubled to over two million voters. In 2018, a lower-turnout midterm election, over 1.9 million voters voted by mail. This rapid growth in mail ballots is not surprising. Arizona has engaged in extensive efforts to increase its use.

~~20.~~21. Since 2007, Arizona has maintained a Permanent Early Voter List, commonly known as the "PEVL," under which any Arizona voter can choose to automatically receive a mail ballot for every election. A.R.S. § 16-544(A). Since the PEVL's creation, Arizona has actively encouraged its voters to sign up and participate in the program. As a result, mail voting is exceedingly popular in Arizona, and today approximately 80% of Arizona voters receive their ballot in the mail.

~~21.~~22. Voters who are enrolled in the PEVL, or who request a mail ballot at least 27 days before the election, are entitled to ~~receive~~be sent a mail ballot between 24 and 27 days before the election. A.R.S. § 16-542(C). A mail ballot is sent to voters by first-class, non-forwardable mail. It must be accompanied by a postage-prepaid return envelope, an affidavit, and instructions to complete the mail ballot. *See* 2014 Arizona Elections Manual, Chapter 3 - Early Voting, 56.

~~22.~~23. To be counted, a voter's ballot and accompanying affidavit must be received by the voter's county recorder's office by 7 p.m. on Election Day. A.R.S. § 16-548(A).

-7-

Ballots received after 7 p.m. on Election Day are rejected, even if they were mailed well in advance of the election, and including ballots mailed by the five, six, and seven-day Pre-Election Cutoff promoted by the Secretary of State and county recorders' offices.

23.24. Arizona voters have some non-mail alternative options to return their ballot outside of the mail; however, by far the most popular method is to return the ballot the same way that it arrived—via mail. In the most recent presidential election, approximately 90% of Arizona voters who voted with a mail ballot returned their ballot to their county through the U.S. postal service.

24.25. Voters also have the option to personally drop their ballot off at the county recorder's office or at any polling location on Election Day. A.R.S. § 16-548. But these options are more time-consuming and burdensome for voters in rural counties who often live many miles from a drop-off location, as well as Hispanic and Latino voters who have difficulty obtaining transportation or leaving work during the window in which recorders' offices and polling locations are open. As a result, these options are less popular and less accessible to Arizona voters. In the most recent presidential election, only 10% of Arizona voters who voted with a mail ballot returned it to a physical location such as a polling place or county recorder's office.

25.26. Furthermore, in recent years Arizona has passed or contemplated legislation that would strip away these non-mail alternative options. One previously popular method of returning a ballot was ballot collection, in which a voter would entrust their ballot to an advocate, volunteer, friend, or neighbor to personally deliver it to election officials. That practice That practice, which Arizona's Hispanic and Latino, Native American, and African American voters relied on to overcome the challenges they face in returning mail-in ballots—e.g., unreliable mail service, restrictive work schedules, or lack of access to transportation—was criminalized in 2016. *See* A.R.S. § 16-1005(H)-(I); *see also Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824 (D. Ariz. 2018), *aff'd*, 904 F.3d 686 (9th Cir. 2018), *reh'g en banc granted*, 911 F.3d 942 (9th Cir. 2018) *("DNC")*.

26.27. Further, during the most recent legislative session, the Arizona Legislature contemplated, but ultimately decided against, banning all methods of ballot return other than the mail. S.B. 1046 (2019). The bill's sponsor has stated that she will introduce the legislation again in the next session.

27.28. Once the Election Day Receipt Deadline has passed, Arizona begins processing its ballots. When voters cast a mail ballot in Arizona, election officials must confirm that each voter did not vote in person, verify the voter's eligibility to vote, and open and scan the voter's ballot. *See* A.R.S. § 16-552. If a ballot was received in time, but appears to be invalid (because it has, for example, an incomplete affidavit or an apparently mismatched signature), election officials will contact the voter, who has five business days in which to cure their ballot. A.R.S. § 16-550. Election officials have 20 days after Election Day to complete the count and certify results. *Id.* § 16-642(A).

### The Election Day Receipt Deadline

28.29. Every election a substantial and increasing number of ballots are discarded because they arrive after the Election Day Receipt Deadline. While the publicly available data is incomplete, even the partial picture is alarming. In 2008, only seven counties reported data on late-returned ballots, but those counties collectively rejected 1,611 ballots for arriving after the Election Day Receipt Deadline. In 2012, those same seven counties rejected more than double that amount—4,107 ballots. And in the 2018 generalmidterm election, Maricopa County alone rejected 1,535 ballots for arriving late,a lower turnout election than either the 2008 and Navajo County2012 general elections, ten of Arizona's fifteen counties collectively reported rejecting an eye-popping 3,062 late ballots—over 8 percent of all ballots cast in that county.more than 2,500 ballots because they arrived after the Election Day Receipt Deadline.

29. Precincts *within* counties also report substantial variation in ballot arrival times, reflecting just how arbitrary mail service can be even within a county. In Navajo County, for example, the percentage of early ballots that arrived late ranged from a low of 2 percent in some precincts to as high as 12 percent in others.

30.    The numbers speak for themselves; clearly, ~~a large swath~~thousands of Arizona voters believe their ballot is timely even when it is not. Because of the challenges in estimating mail delivery times, elections officials—much less the average voter—cannot accurately predict when ballots must be mailed to ensure that they arrive by the Election Day Receipt Deadline. In the 2014 general election, for example, the Arizona Secretary of State's Office "named Thursday, Oct. 30, the 'deadline' for mailing in early ballot so they will arrive in time," but noted that "[that] deadline is unofficial and was set as a guideline based on the time it takes a ballot to reach a county recorder's office." As the Communications Director for the Arizona Secretary of State's Office explained, if a voter did not mail their ballot by that Thursday, voters should not put their ballot in the mail "because it *may or may not* get here on time," and if "it arrives [the day after the election] it won't count." *See* Rachel Lund, *Late With Your Early Ballot? Here Are Tips for Making Sure Your Vote is Counted*, Arizona Capitol Times (Oct. 30, 2014), https://azcapitoltimes.com/  news/2014/10/30/az-late-early-ballot-tips-to-make-sure-vote-counts/ (emphasis added).

31.    County Recorders have not been able to provide any more clarity to voters. In fact, just last month, the Pima County Recorder's Office provided two different "recommended deadlines" for when voters were "required" to mail their ballot for it to be counted.[1] Counties' recommendations on when to place a ballot in the mail shift for a simple reason: those recommendations are purely guesses.

32.    Without clear guidance from election officials, Arizona voters are themselves forced to guess when their ballots must be placed in the mail to ensure that they will be counted. In any event, many ballots that are rejected for arriving too late are mailed and

---

[1] The Pima County Recorder's Office website, for example, currently recommends that voters mail their ballots by the Thursday before the election to ensure their ballots would be counted. But just weeks ago, the same Pima County Recorder's Office issued a press release for the most recent election instructing voters to mail their ballots on or before the Wednesday before the election to ensure their ballots would be counted.

postmarked *before* Election Day, on the erroneous belief that a ballot is timely as long as it is postmarked by Election Day.

33.     The Election Day Receipt Deadline, and the confusion it generates, contributes to Arizona voters' remarkable lack of confidence that their ballots are actually counted. Compared to voters in all 50 states, Arizona voters are the least likely to say that they are confident that their own vote was actually counted. And compared to voters in all 50 states, Arizona voters are the most likely to say they were "not too confident" or "not at all confident" that the votes of other people in their city or county were actually counted.

34.     The widespread belief that a ballot is timely as long as it is postmarked by Election Day is reasonable; it is consistent with the way mail-related deadlines are administered under the state law and across modern life. Postmarks are used to assess the timeliness of payments, applications, and other documents submitted to the government in other contexts: taxes and other state-mandated deadlines are determined according to postmarks, not the date—much less the time of day—the mailed item is actually received. *See, e.g.*, A.R.S. § 1-218(A) (requiring documents related to taxes, including returns, statements, and payments, that have been mailed to "be deemed filed and received by the addressee on the date shown by the postmark"); A.R.S. § 20-191 (stating that insurance premium payments made by mail are deemed timely as of the date shown on the postmark); Ariz. Admin. Code R17-4-304 (stating the date of receipt of applications for vehicle registrations is the date of the postmark stamp).

35.     Postmark rules make good sense. Mail delivery times in Arizona are unpredictable, particularly in rural areas where home delivery is not common and even local mail is often re-routed through central processing facilities in far-flung cities. This unpredictability increases the risk of a late-arriving ballot, even when voters mail their ballots well in advance of Election Day.

36.     A postmark rule is also particularly key in the voting context because it aligns with practical realities of the election cycle. Campaigns often consider the final week before the election to be a key week of voter engagement and activity. Candidates, advocacy

organizations, political volunteers and the like conduct "get-out-the-vote" activities, canvasses, town hall meetings, candidate Q&A sessions, and all manner of voter engagement during the final crucial days of the election cycle. Frequently, late-breaking news can entirely change the landscape for a race, and voters can and should remain open to new information until Election Day itself.

37.    For example, during the 2016 presidential preference election, tens of thousands of votes arrived for Marco Rubio, even though he dropped out of the race in the final days before Election Day. But due to the Election Day Receipt Deadline, and the corresponding Pre-Election Cutoff deadlines for casting their ballots, those voters were unable to consider that information before casting a ballot for a nonexistent candidate. If the Election Day Receipt Deadline had not been in place, those voters could have re-allocated their votes among other Republican candidates who actually remained in the race, giving those voters the opportunity to truly participate in the election. It is clear that what happens in the final days before an election matters, and the Election Day Receipt Deadline deprives voters of the opportunity to take those events into account.

38.    Further, the Election Day Receipt Deadline is unreasonable because it unnecessarily shortens voters' time to return their ballots. A postmark rule would allow the State to accept ballots received within a reasonable time after Election Day, which makes sense given that Arizona has 20 days after Election Day to complete the vote-counting process. A.R.S. § 16-642(A). Arizona already permits voters to cure incomplete ballots up to five business days after Election Day. *Id.* § 16-550. Thus, counting ballots that have been postmarked by Election Day, as long as they are received within <u>a reasonable period after Election Day (at a minimum, within </u>the five-business-day cure period<u>,)</u>, would align with Arizona's existing voting laws and provide all Arizona voters sufficient time to have their votes counted.

<u>39.    In addition to the unreasonable burdens the Election Day Receipt Deadline places on Arizona voters, it has real consequences for Arizona elections. Over the last several election cycles multiple races in Arizona have been decided by narrow margins of</u>

anywhere from 100 votes to a mere margin of 20 votes. The 2,500 to 4,000 votes rejected by Arizona each year because of its Election Day Receipt Deadline could easily have made the difference in these election outcomes. And allowing the State to count these votes would correspondingly have saved the State and counties significant resources spent on costly recounts and post-election litigation.

39.40. The State has no legitimate interest in imposing the Election Day Receipt Deadline, particularly where it has pushed Arizona voters to utilize mail voting and has provided very limited alternative options for returning those ballots. While Arizona may set a reasonable deadline for receiving ballots to ensure the finality of election results, the Election Day Receipt Deadline is not reasonable: voters do not reasonably expect that they must submit their ballots so far ahead of Election Day—nor could they, given that even election officials are not sure what the precise date for mailing in ballots should be, the requirement to do so is poorly communicated to voters, and it is completely unnecessary to ensure that all ballots are received and counted within a reasonable time.

**The Election Day Receipt Deadline's Effect on Rural and Minority Voters**

40.41. The Election Day Receipt Deadline has a disproportionately severedisproportionate impact on rural and Hispanic and Latino voters in Arizona. In 2018, for example, in 2018, approximately 1,535 voters were disenfranchised in rural Navajo County were 4.5 times more likely to have their mail ballot rejected for arriving after the Election Day Receipt Deadline than voters in urban Maricopa County. In contrast, 3,062 late ballots were reported in Navajo County and 6,227 ballots were reported as late in YumaIn rural Cochise County, both of which have a significantly smaller number of registered voters than the ratio jumps to 5.1, and in Santa Cruz County, voters are 5.9 times more likely to have their ballot rejected for arriving after the Election Day Receipt Deadline than voters in Maricopa County. And Arizona's Hispanic and Latino voters are disparately disenfranchised no matter where they live. Indeed, in rural counties, Hispanicsnot only are nearly five to sixballots 7.6 times more likely to be disenfranchised than white voters rejected for failure to arrive by the Election Day Receipt Deadline, in rural Hispanic and

Latino counties such as Santa Cruz, but even in urban Maricopa County, ~~they~~Hispanic and Latino voters are twice as likely to be disenfranchised by the Election Day Deadline Receipt than white voters are.

41.42. None of this is surprising; mail delivery in rural Arizona is complicated and ~~ridden~~riddled with delays, and Arizona's long-history of discrimination interacts directly with the Election Day Receipt Deadline to make it more difficult for Hispanic and Latino voters to timely cast their mail-in ballots.

42.43. Voters living in rural areas of Arizona lack reliable mail service. These voters typically do not have mailboxes at their homes and often do not receive personal mail delivery services. Rather, they must frequently ~~must~~ travel to one of a few post offices, many miles away from where they live and work, to either pick up or drop off their mail. Given the long distance, long work days, lack of readily available transportation, whether public or personally owned, and correspondingly poor roadways, these voters are not able to visit the post office with any regularity. As a consequence, arranging to pick up their ballots at the post office 24 and 27 days before the election, and then dropping them off not long thereafter to meet the Election Day Receipt Deadline is particularly difficult for rural voters.

43.44. Further, there is no guarantee that rural voters' ballots will arrive by the Election Day Receipt Deadline given the unusual routing system used in rural parts of Arizona. Because local mail in rural areas is not sent directly from one rural address to another nearby address and is instead re-routed through a central processing facility in some other part of the state, delivery times increase. Consequently, rural voters are uniquely required to mail their ballots well in advance of Election Day. Otherwise, they risk having their ballots rejected—through no fault of their own—for arriving after the Election Day Receipt Deadline. Mailing their ballots a significant number of days before Election Day is no guarantee that their ballots will arrive on time.

44. Rural Arizona also contains a number of communities that are predominately populated by minority voters. And as an Arizona district court recently found, "[r]eady

access to reliable and secure mail service is nonexistent" in some of these minority communities. *See DNC*, 329 F. Supp. 3d at 869.  Native American voters, in particular, traditionally struggle with mail service because of, among other things, a severe lack of postal service infrastructure within their communities. ~~On the Navajo Reservation for example,~~

~~45.   reservation residents rely on a patchwork of trading posts, contract post offices, regular post offices and commercial mail services, along with trucks shuttling mail among far-flung operations that may be a several-hour drive from any given tribal member's home. Once a ballot is in this system, it travels to the reservation voter or back to the county via a sorting facility in Arizona, New Mexico or Utah, sometimes via multiple states.[2]~~

46.45.  ~~Given this patchwork of services, Native American voters who utilize voting by mail are particularly vulnerable to Arizona's strict enforcement of its Election Day Receipt Deadline. Indeed, during the past election, numerous ballots were rejected due to the Election Day Receipt Deadline in Native American precincts throughout Navajo County.~~

47.46.  Rural Hispanic and Latino voters in Arizona also face similar problems in accessing secure and reliable mail service. For example, in heavily Hispanic San Luis and Somerton, for example, voters often lack home delivery mail service or live miles away from the nearest post office. In San Luis specifically, which is 98% Hispanic, nearly all of the city's residents must rely on a single post office that is located across a major highway to send and receive mail, even though the vast majority of San Luis' residents lack reliable transportation and there is no available taxi service. Given the distance they must travel to send mail, these residents tend to visit the post office infrequently.

48.47.  Even in more urban neighborhoods, Hispanic and Latino voters often face difficulties with unsecure mail boxes and fear that mail will be stolen from their homes. For example, some voters live in neighborhoods with one community mailbox that does not

---

[2] Stephanie Woodard, Return to Sender: Navajo Voteres Reject Mail-in Voting, IN THESE TIMES (Mar. 12, 2016), https://inthesetimes.com/rural-america/entry/18963/mail-in-voting-on-navajo-reservation-may-violate-voting-rights-act.

accept outgoing mail and voters are required to put their mail in an open basket next to the mailbox, with no means of securing it. These voters are thus reluctant to mail a ballot from their homes and must make longer journeys to mail their ballots from a more secure location. Despite the difficulties in mailing back ballots, it still is the best return method in those communities because inflexible work schedules and a lack of transportation often mean that dropping a ballot off in person at the county recorder's office or at a polling location on Election Day is not feasible.

49.48. These difficulties are exacerbated when voters, through no fault of their own, do not receive their ballots in the mail until close to a week before the election is scheduled to take place, requiring that the voter return the ballot personally, rather than by mail, to ensure that it arrives by the deadline.

50.49. As discussed in more detail below, as a result of Arizona's long history of discrimination, Hispanic and Latino voters are also disproportionately more likely than white voters to have economic or personal circumstances—including, but not limited to, language barriers and limited English fluency, lack of reliable transportation to mail their ballots, or difficulties in taking time off work to do the same—that make it even more challenging to comply with the Election Day Receipt Deadline.

51.50. For example, the Election Day Receipt Deadline disparately impacts Arizona's Hispanic and Latino voters who are often less educated than white voters due to persistent gaps in education. As a result, Hispanic and Latino voters are less likely to be aware of the Election Day Receipt Deadline. caused by historical and on-going discrimination. *See* James Thomas Tucker, et al., *Voting Rights in Arizona: 1982-2006*, 17 Rev. L. & Soc. Justice 283, 284 - 341 (2008). As a result, as one court has explained, "[d]ue to their lower levels of literacy and education, minority voters are more likely to be unaware of certain technical rules, such as the requirement that early ballots be received by the county recorder, rather than merely postmarked, by 7:00 p.m. on Election Day." *See DNC*, 329 F. Supp. 3d at 868.

52.51. Further, given the lack of language assistance provided to voters—coupled with Arizona's sustained resistance to bilingual education and mandated English-only education, *see* Tucker, *supra* at 284-341—Hispanic and Latino voters experience ongoing language barriers that make them less likely to understand the instructions provided by county election officials regarding the Election Day Receipt Deadline. This is further complicated by the fact that, historically, Spanish-speaking voters have received incorrect and misleading information from election officials.  In the two most recent presidential cycles, for example, Spanish-speaking voters received incorrect information about the election, ranging from wrong election dates to wrong titles for measures on those voters' official ballots.

53.52. Moreover, the receiptArizona's dissemination of incorrect and inaccurately translated information breeds distrust and infuses more confusion into the election process, making it particularly difficult for Hispanic and Latino voters to understand the shifting five, six, and seven day deadlines for mailing in a mail-in ballot, particularly where those deadlines do not comport with other standard deadlines for mailing government documents in Arizona.

54.53. Finally, due to disparities in incomeFinally, "[r]acial disparities between minorities and non-minorities in socioeconomic standing, income, employment, education, health, housing, transportation, criminal justice, and electoral representation have persisted in Arizona." *DNC*, 329 F. Supp. 3d at 876. As a result, Hispanic and Latino voters experience higher rates of poverty than white voters, and often have less access to reliable transportation and less flexible work schedules, both of which make it more difficult for them to travel to the post office, polling location, or county recorder's office to submit their ballots in time to meet the Election Day Receipt Deadline.

55.   Given this evidence, it is clear that voters living in rural communities and Hispanic and Latino voters across the state are disproportionately affected by the Election Day Receipt Deadline and, without action from this Court, will continue to be in upcoming elections.

**56.    Arizona's History of Discrimination Against Racial, Ethnic, and Language Minorities**

57.    Arizona has a lengthy history of discrimination that has made it more difficult for minorities to participate in the political process and elect candidates of their choice. These discriminatory actions resulted in Arizona becoming, in 1975, a covered jurisdiction subject to federal preclearance for any change to its voting laws, practices, or procedures, under Section 5 of the Voting Rights Act.

58.    When Arizona became a state in 1912, Native Americans were excluded from voting.[3] Even after the United States Congress passed the Indian Citizenship Act in 1924, recognizing Native Americans as citizens and, thereby, affording them the right to vote, Arizona's Constitution continued to deny Native Americans that right. It was not until 1948 when the Arizona Supreme Court found that such treatment was unconstitutional that Native Americans were granted the right to vote in Arizona. *See Harrison v. Laveen*, 196 P.2d 456, 463 (Ariz. 1948). Despite being granted the legal right to vote in 1948, Native Americans, as well as Hispanics and African Americans, have continued to face barriers to participation in the franchise and elect candidates of their choice.

59.    In 1912, Arizona enacted an English literacy test for voting. The test was enacted specifically "to limit 'the ignorant Mexican vote.'" David R. Berman, *Arizona Politics and Government: The Quest for Autonomy, Democracy, and Development* at 48-49 (UNIV. OF NEV. PRESS 1998). Furthermore, well into the 1960s it was also a practice for white Arizonans to challenge minority voters at the polls by asking them to read and explain literacy cards. In 1970, Congress amended the Voting Rights Act to enact a nationwide ban on literacy tests after finding that they were used to discriminate against voters on account

---

[3] Hispanics were granted the right to vote in Arizona when it became a state in 1912 by virtue of the Treaty of Guadalupe Hidalgo, which was signed in 1848 at the close of the Mexican-American War. The treaty required that Congress pass legislation recognizing all Mexican Americans as full U.S. citizens. Prior to becoming a state, Arizona (which was a U.S. territory) did not allow Mexican Americans to vote. Notably, as discussed herein, at the time that it became a state in 1912, Arizona enacted an English literacy test which had the effect of preventing these newly enfranchised Mexican Americans (as well as Native Americans and African Americans) from voting.

1    of their race or ethnicity. *See Oregon v. Mitchell*, 400 U.S. 112, 118 (1970). In reaching that

2    finding, Congress specifically cited evidence which showed "that voter registration in areas

3    with large Spanish American populations was consistently below the state and national

4    averages." *Id.* at 132. Congress found that, "[i]n Arizona, for example, only two counties

5    out of eight with Spanish surname populations in excess of 15% showed a voter registration

6    equal to the state wide average." *Id.* Congress also noted that Arizona had a serious

7    deficiency in Native American voter registrations. *See id.* Rather than comply with the law

8    and repeal its literacy test, Arizona challenged the ban, arguing that it could not be enforced

9    to the extent that it was inconsistent with the State's literacy requirement. *Id.* at 117. The

10   United States Supreme Court upheld Congress's ban. *Id.* at 131-33. Nevertheless, Arizona

11   waited until 1972, two years after the Court's decision, to repeal its literacy test.

12         60.     Arizona's English literacy test also compounded the effects of the State's long

13   history of discrimination in the education of minority citizens. From 1912 until the Supreme

14   Court's decision in *Brown v. Board of Education*, segregated education was widespread

15   throughout Arizona, and sanctioned by both the courts and the state legislature. *See*

16   *Dameron v. Bayless*, 126 P. 273 (Ariz. 1912); *see also Ortiz v. Jack*, No. Civ-1723 (D. Ariz.

17   1955) (discontinuing segregation of Mexican children at schools); *Gonzales v. Sheely*, 96

18   F. Supp. 1004, 1008-09 (D. Ariz. 1951) (enjoining segregation of Mexican school children

19   in Maricopa County). Spanish speaking students were directly targeted based on their

20   language.

21         61.     Even where schools were not segregated, Arizona enacted restrictions on

22   bilingual education, mandating English-only education in public schools as early as 1919.

23   *See* James Thomas Tucker, et al., *Voting Rights in Arizona: 1982-2006*, 17 Rev. L. & Soc.

24   Justice 283, 284 (2008). Many of these English-only restrictions have remained in effect in

25   some form to the present day, despite the fact that such programs have led to poor

26   educational outcomes for Arizona's students. *See id.* at 339-40 (noting "[t]he available

27   evidence in Arizona reveals that bilingual education programs have been more effective at

28   raising students' test scores than [English-immersion programs]").

62.   Indeed, as recently as 2000, Arizona banned bilingual education with the passage of Proposition 203. This ballot initiative, which is only the second of its kind to be passed in the United States, is the most restrictive ban on bilingual education in the nation. In addition to severely restricting the educational opportunities of limited English proficiency students in Arizona, the law has led to widespread confusion and discrimination as well, with reports of students being slapped for speaking Spanish at school and teachers being afraid they will be fired if they communicate with students in Spanish, even when outside of the classroom. *Id.* at 341.

63.   In addition to Arizona's formal prohibitions on bilingual education, the State has a long record of failing to provide adequate funding to teach its non-English speaking students—one of "the largest and fastest growing segments of the school population in Arizona." *Id.* at 338-39 ("As of 2000, there were almost 140,000 [non-English speaking] students enrolled in Arizona public schools."); *see also id.* at 339. In some instances, the State has reportedly underfunded its programs for non-English speaking students by as much as ninety percent, leading to high illiteracy and dropout rates. Remarkably, this underfunding has taken place despite multiple court orders instructing Arizona to develop an adequate funding formula for its programs, including a 2005 order in which Arizona was held in contempt of court for refusing to provide adequate funding for its educational programs. *Flores v. Arizona*, 405 F. Supp. 2d 1112 (D. Ariz. 2005), *vacated*, 204 Fed. App'x 580 (9th Cir. 2006).

64.   Arizona's history of segregation, limitations on bilingual education, and systemic underfunding of education for non-English speaking students not only contributes to educational disparities amongst Arizona's Hispanic and Native American populations but, when combined with Arizona's literacy test, has had the effect of denying Hispanics and Native Americans the right to vote and elect candidates of their choice.

65.   More recently, Arizona passed discriminatory measures to make it more difficult for minority voters to cast their ballots and elect candidates of their choice.  In 2016, elections officials in Arizona's most populous county, Maricopa County, made

national headlines when, due to their decision to drastically reduce the number of voting locations for the March 22 presidential preference election, they forced thousands of voters to wait in lines for upwards of five hours to cast their votes for their preferred presidential nominee. In many cases, voters were unable to wait in these multi-hour lines and were wholly disenfranchised. The reduction of voting locations was particularly burdensome for Maricopa County's Hispanic and African-American communities, many of which had fewer polling locations than Anglo communities and, in some instances, no voting locations at all.

66.    Also in 2016, the Arizona State Legislature passed H.B. 2023, which severely restricted the collection of mail-in ballots. Prior to H.B. 2023's passage, Native American, Hispanic, and African-American voters relied heavily on the practice of ballot collection to overcome the challenges they face in returning mail-in ballots—e.g., unreliable mail service, restrictive work schedules, lack of access to transportation—and to ensure that their ballots arrived at the county recorder's office by the Election Day Receipt Deadline. H.B. 2023 was passed largely along partisan lines; supporters of the bill not only ignored the devastating impact that the loss of ballot collection would have on these communities, but they also utilized racial appeals in securing its passage. *See DNC*, 329 F. Supp. 3d at 876-77. Though a challenge to H.B. 2023 is pending in federal court, ballot collection in Arizona remains severely restricted to date.

67.    Due to its long history of discrimination, Arizona was one of only three states to be covered under Section 4(f)(4) of the Voting Rights Act for Spanish Heritage. Twelve of its 15 counties, including Maricopa County, are also covered separately under Section 203, which requires minority language assistance. As a result of its inclusion under the Voting Rights Act, Arizona had some improvements in the numbers of Hispanics and Native Americans registering and voting and, relatedly, in the overall representation of minority-elected officials in the State.

68.    Nevertheless, Arizona also has a recognized history of racially polarized voting that continues today. *See DNC*, 329 F. Supp. at 876; *Feldman v. Ariz. See'y of State's*

1  ~~*Office*, 843 F.3d 366, 406-07 (9th Cir. 2016); *Gonzalez v. Arizona*, 677 F.3d 383, 407 (9th~~
2  ~~Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013).~~
3  ~~In the most recent redistricting cycle, the Arizona Independent Redistricting Commission~~
4  ~~found that at least one congressional district and five legislative districts clearly exhibited~~
5  ~~racially polarized voting. *See* Gary King, et al., *Racially Polarized Voting Analysis (Draft)*,~~
6  ~~Ariz.    Indep.    Redistricting    Comm'n,    10,    20    (2011),    *available    at*~~
7  ~~https://azredistricting.org/Meeting-Info/AZ%20racially%20polarized%20voting%20analy~~
8  ~~sis%20112911%20-%20DRAFT.pdf. Exit polls for the 2016 general election demonstrate~~
9  ~~that voting between non-minorities and Hispanics continues to be polarized along racial~~
10 ~~lines. *DNC*, 329 F. Supp. 3d at 876.~~

11 ~~69.    Thus, only one Hispanic and African American have ever been elected to~~
12 ~~statewide office, and Arizona has never elected a Native American to statewide office. No~~
13 ~~Native American or African American has ever been elected to the U.S. House of~~
14 ~~Representatives to represent Arizona or served on the Arizona Supreme Court. Further, no~~
15 ~~Hispanic, Native American, or African American has ever served as a U.S. Senator~~
16 ~~representing Arizona or as Attorney General for the State of Arizona.~~

17 ~~70.    It is also well settled that "[r]acial disparities between minorities and non-~~
18 ~~minorities in socioeconomic standing, income, employment, education, health, housing,~~
19 ~~transportation, criminal justice, and electoral representation have persisted in Arizona."~~
20 ~~*DNC*, 329 F. Supp. 3d at 876.~~

21 ~~71.~~54. Indeed, according to the U.S. Census Bureau's 2013-2017 American
22 Community Survey 5-Year Estimates, Hispanic, African-American, and Native-American
23 poverty rates in Arizona exceeded the white poverty rate for that same time period. Based
24 on the 5-Year Estimates, as of 2017, Hispanics, Native Americans, and African Americans
25 were all less likely to graduate high school in Arizona than whites were. Further, whites
26 were nearly 1.5 times more likely to have a bachelor's degree than African Americans,
27 almost three times more likely than Hispanics, and more than three times as likely as Native
28 Americans in Arizona.

72.55. Decades of research have demonstrated that deficiencies in socio-economic standing, such as those described above, significantly impact an individual's ability to fully participate in the political process, and the interaction between these deficiencies and the Election Day Receipt Deadline is no different. Thus, while Arizona's Election Day Deadline Receipt burdens all voters, it also imposes a disproportionate burden on Arizona's rural and Hispanic and Latino voters.

1. There is a clear causal link between Arizona's history of discrimination and the likelihood that a voter will miss the Election Day Receipt Deadline. For example, Arizona's history of language-based discrimination—including a recent history of errors in Spanish language voting materials—makes it far more likely for Spanish-speaking voters to be misinformed about voting rules, such as when they must mail their ballots and when their ballot needs to arrive by. As one court has explained, "[d]ue to their lower levels of literacy and education, minority voters are more likely to be unaware of certain technical rules, such as the requirement that early ballots be received by the county recorder, rather than merely postmarked, by 7:00 p.m. on Election Day." *See DNC*, 329 F. Supp. 3d at 868. Minority voters are more likely to live in lower-income and tribal communities, many of which lack secure outgoing mailboxes, which makes it more difficult to return a mail ballot. The disparate lack of reliable access to transportation also makes minority voters less able to access a sometimes far-flung post office or outgoing mail box. And economic constraints often require minorities to work multiple jobs and shift-work, which often results in less flexibility to turn in a mail ballot by another means such as in-person at the county recorder's office or a polling location.

Thus, the on-going effects of Arizona's history of discrimination are directly linked to the Election Day Receipt Deadline and the burdens that it places on Arizona's minority voters.

## CLAIMS FOR RELIEF

## COUNT I

### First and Fourteenth Amendments
### U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202
### *Undue Burden on the Right to Vote*

~~73.~~56. Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

~~74.~~57. Under the *Anderson-Burdick* balancing test, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the State for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

~~75.~~58. This balancing test utilizes a flexible sliding scale, where the rigorousness of scrutiny depends upon the extent to which the challenged law burdens voting rights. *See Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016); *see also Akins v. Sec'y of State*, 154 N.H. 67 (2006) (applying *Anderson-Burdick* and holding that strict scrutiny was the correct test to determine constitutionality of ballot order system that prioritized candidate names alphabetically).

~~76.~~59. Courts need not accept a state's justifications at face value, particularly where those justifications are "speculative," otherwise it "would convert *Anderson-Burdick*'s means-end fit framework into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe." *Soltysik v. Padilla*, 910 F.3d 438, 448–49 (9th Cir. 2018) (citing *Pub. Integrity All.,* 836 F.3d at 1024–25); *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) ("However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests *sufficiently weighty to justify the limitation*.") (internal citation and quotation marks omitted) (emphasis added).

-24-

77.60. Arizona's Election Day Receipt Deadline imposes a severe burden on all Arizona voters—and rural and Hispanic and Latino voters in particular—who vote by mail. These voters must first learn about the Election Day Receipt Deadline and accurately guess when their ballot must be mailed for it to be counted. For voters who, through no fault of their own, misjudge how long it will take for their ballot to arrive back to their county, or for those who never learn about Arizona's Election Day Receipt Deadline, the punishment is swift and severe: total disenfranchisement. But Arizona's Election Day Receipt Deadline also severely burdens all voters who vote by mail even if those voters' ballots are successfully counted. By requiring its voters to cast their mail ballots a week before the election in order for those ballots be counted, Arizona's Election Day Receipt Deadline forces Arizona voters to cast their ballots before they can account for any critical information about the election or the candidates that arises during the final week leading up to Election Day—arguably, the most critical week in an entire election cycle. Arizona's Election Day Receipt Deadline thus deprives voters of the ability to engage in this robust period of civic engagement, because it effectively requires them to have already cast their vote.

78.61. While Arizona's imposition of its Election Day Receipt Deadline burdens all Arizona voters who vote by mail, it also particularly impacts subgroups, like Arizona's rural population and its Hispanic and Latino voters, who, given where they live, must often cast their ballots even further in advance of Election Day to ensure their ballots will arrive by the Election Day Receipt Deadline. Arizona's Election Day Receipt Deadline also generally imposes a particularly heavy burden on Hispanic and Latino voters, who face heightened barriers to participation in Arizona's mail ballot system.

79.62. While Arizona has a legitimate regulatory interest in a *general* cutoff for receiving ballots, the State derives no meaningful benefit from imposing the Election Day Receipt Deadline, particularly where it has heavily promoted mail-in balloting and encouraged over 80 percent of its electorate to vote by mail. Arizona has a full 20 days to finalize election results, and it already allows voters to cure otherwise incomplete ballots a

full five business days after Election Day. Arizona would suffer no significant administrative burden if it, at a minimum, extended that same five-business-day deadline to permit for the receipt of ballots that were postmarked on or before Election Day, but which arrive within five business days after the election. In fact, the extension of the deadline would likely decrease administrative burdens and improve election outcomes in Arizona by providing the State and counties with the opportunity to count all votes cast in close races, avoiding potential recount and post-election litigation costs. Arizona thus has no legitimate interest, and certainly no compelling interest that is narrowly drawn, in rejecting ballots that are postmarked before or on Election Day and which are received within, at a minimum, five business days after Election Day.

80.63. In short, Arizona's Election Day Receipt Deadline is not supported by a state interest that is sufficient to justify the resulting burden on the right to vote, and thus unduly burdens the right to vote of all Arizona voters generally and Arizona's rural and Hispanic and Latino voters in particular in violation of the First and Fourteenth Amendments.

**<u>COUNT II</u>**

**Due Process**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
***Denial of Procedural Due Process***

81.64. Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

82.65. The Due Process Clause of the United States Constitution prohibits the states from depriving "any person of . . . liberty . . . without due process of law." U.S. CONST. amend. XIV, § 1. Which protections are due in a given case requires a careful analysis of the importance of the rights and the other interests at stake. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976); *Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1192 (9th Cir. 2015). Courts must first consider "the nature of the interest that will be affected" by the government's action as well as the "degree of potential deprivation that may be created" by existing procedures. *Nozzi*, 806 F. 3d at 1192–93. Second, "courts must consider the

'fairness and reliability' of the existing procedures and the 'probable value, if any, of additional procedural safeguards.'" *Id*. at 1193 (quoting *Mathews*, 424 U.S. at 343). Finally, courts must consider "the public interest, which 'includes the administrative burden and other societal costs that would be associated with' additional or substitute procedures. *Id.* (quoting *Mathews*, 424 U.S. at 347).  Overall, "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334, (quotation and citation omitted).

83.66. Arizona's procedures for voting by mail must comport with due process. *See Raetzel v. Parks/Bellemont Absentee Election Bd*., 762 F. Supp. 1354, 1358 (D. Ariz. 1990). "Such due process is not provided when the election procedures [for voting by mail]" do not adequately protect the right to vote or ensure that an "individual is not continually and repeatedly denied so fundamental a right." *Id.*; *see also Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted.").

84.67. "When an election process 'reache[s] the point of patent and fundamental unfairness,' there is a due process violation." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183 (11th Cir. 2008) (quoting *Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995)). A state's elections system, "the specifics of which are not explicitly made known to potential voters, that leaves potential voters in the dark as to its effect on a voter's [ability to vote] and that fails to give voters a fair opportunity to [participate], is fundamentally unfair and violative of the Due Process Clause of the Fourteenth Amendment." *Id.* at 1185.

85.68. The nature of the interest at stake in this case—the right to vote and to have that vote count—is the most precious liberty interest of all because it is preservative of all other basic civil and political rights.

86.69. But Arizona's existing procedures for counting mail ballots too often deprive voters of having their ballot counted because (1) many voters do not learn of the Election

Day Receipt Deadline before Election Day, and (2) even voters who do learn of the Election Day Receipt Deadline may not have their ballots counted if those ballots do not arrive in the mail at the county recorder's office, through no fault of their own, by 7 p.m. on Election Day. Arizona's Pre-Election Cutoff further deprives all Arizona voters who vote by mail of the ability to cast a meaningful and informed vote by requiring voters to cast their ballots a full week (or more) before Election Day if they wish to ensure that their ballots will actually be counted.

87.70. Arizona's Election Day Receipt Deadline is neither a reliable nor fair way to administer voting by mail. The Election Day Receipt Deadline and the corresponding Pre-Election Cutoff for casting ballots is, in fact, devoid of reliability because Arizona's elections officials can only offer voters their best guess of when voters must place their ballots in the mail for it to be counted. Nor is the Election Day Receipt Deadline fair because it effectively requires some voters—particularly rural voters and minority voters—to cast their ballots before the rest of the electorate if they wish to be afforded the same process as other voters in the State and to have their votes counted. Arizona's Election Day Receipt Deadline is also not fair to all Arizona voters who vote by mail because it forces those voters to cast their ballots with incomplete information and before candidates have delivered their final pitches to the voters.

88.71. The value of additional or substitute procedural safeguards to ensure that the votes of Arizona's mail voters are both meaningfully cast and actually counted is readily apparent. A substitute procedure—requiring mail ballots to be postmarked on or before Election Day and received by the county within, at a minimum, five business days after Election Day to be counted—solves the inequities inherent in Arizona's Election Day Receipt Deadline. A postmark date not only offers a reliable date to Arizona voters by which they must cast their ballots, but it also ensures that rural voters and minority voters are not more likely to have their ballot rejected simply because they live in a town with slower mail service. A postmark date additionally ensures that all of Arizona's voters can consider any information that may arise and influence voters' choices in the last week of the election.

89.72. Because Arizona is not required to finalize its election results for 20 days after the election and already allows voters to cure incomplete ballots within five business days of the election, requiring Arizona to accept ballots that are postmarked on or before Election Day and which arrive, at a minimum, within five business days of Election Day would put a minimal administrative burden on the state, if any. And as the Supreme Court has explained, "administrative convenience" cannot justify the deprivation of a constitutional right. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975).

90.73. Having induced its voters to vote by mail, Arizona must establish adequate procedures to ensure that voters have a reliable, fair, and effective method to cast their ballots. Because Arizona's Election Day Receipt Deadline is markedly inadequate in all of those respects, and Arizona is readily capable of instituting a substitute procedure which would protect those voters' rights with minimal burden to the state, Arizona's Election Day Receipt Deadline violates Arizona voters' procedural due process rights.

### COUNT III

**Section 2 of the Voting Rights Act - Effects Prong**
**52 U.S.C. § 10301(a)**
***Denial or Abridgement of the Right to Vote***

2. Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

3. Section 2 of the Voting Rights Act provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

4. Arizona's Election Day Receipt Deadline has had and – if this Court does not institute the remedy that Plaintiffs request – will continue to have, an adverse and disparate impact on Hispanic and Latino citizens of Arizona.

5. The Election Day Receipt Deadline makes it more difficult for members of Arizona's Hispanic and Latino community, as compared to white voters, to participate in

-29-

the political process and to elect representatives of their choice. These voters are more likely than white voters to be unaware of the Election Day Receipt Deadline, have their mail ballots arrive after Election Day, and have their ballots rejected.

6.      Thus, these voters are highly likely to face substantial burdens when voting, which are more likely to result in their disparate disenfranchisement and a reduction of their participation in future elections.

7.      Hispanics in Arizona have suffered from, and continue to suffer from, discrimination on the basis of race. The ongoing effects of this discrimination include socioeconomic disparities between Hispanics and whites in Arizona. Arizona's history of language based discrimination—including a recent history of errors in Spanish language voting materials—also makes it far more likely for Spanish speaking voters to be misinformed about voting rules, such as when they must mail their ballots and when their ballot needs to arrive by. "Due to their lower levels of literacy and education, minority voters are more likely to be unaware of certain technical rules, such as the requirement that early ballots be received by the county recorder, rather than merely postmarked, by 7:00 p.m. on Election Day." *See DNC*, 329 F. Supp. 3d at 868. These language barriers, disparities in access to reliable mail service, educational attainment, and other disparities resulting at least in part from the State's long history of discrimination against these communities all cause the Election Day Receipt Deadline to disparately disenfranchise Hispanic and Latino voters. The Election Day Receipt Deadline has caused and will continue to cause an inequality in the opportunity of members of these minority communities to vote in Arizona.

8.      Under the totality of the circumstances, Hispanics and Latinos in Arizona have had—and will continue to have—less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice as a result of Arizona's Election Day Receipt Deadline. Hispanics and Latinos in Arizona therefore have had—and will continue to have—their right to vote abridged or denied on account of race due to the Election Day Receipt Deadline. Thus, under the totality of the circumstances,

1  ~~Arizona's Election Day Receipt Deadline violates the effects prong of Section 2 of the~~
2  ~~Voting Rights Act.~~

3  ### **PRAYER FOR RELIEF**

4  **WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

5      A.      Declaring that Arizona's imposition of its Election Day Receipt Deadline for
6  casting mail ballots and its failure to count the votes of otherwise eligible voters who
7  lawfully mail their ballots before or on Election Day, but whose ballots are not received—
8  through no fault of their own—by 7 p.m. on Election Day, violates the First and Fourteenth
9  Amendments to the United States Constitution by placing an undue burden on those voters
10  and particularly on Arizona's rural and Hispanic and Latino voters by subjecting them to
11  arbitrary and disparate treatment;

12      B.      Declaring that Arizona's imposition of its Election Day Receipt Deadline for
13  casting mail ballots and its failure to count the votes of otherwise eligible voters who
14  lawfully mail their ballots before or on Election Day, but whose ballots are not received—
15  through no fault of their own—by 7 p.m. on Election Day violates the Due Process Clause
16  of the Fourteenth Amendment to the United States Constitution;

17      ~~C.      Declaring that Arizona's imposition of its Election Day Receipt Deadline for~~
18  ~~casting mail ballots and its failure to count the votes of otherwise eligible voters who~~
19  ~~lawfully mail their ballots before or on Election Day, but whose ballots are not received—~~
20  ~~through no fault of their own—by 7 p.m. on Election Day, disparately impacts Hispanic~~
21  ~~and Latino voters and violates Section 2 of the Voting Rights Act;~~

22      D.      Permanently enjoining the Secretary, her respective agents, officers,
23  employees, and successors, and all persons acting in concert with each or any of them,
24  from rejecting ballots that are postmarked by Election Day and arrive at a county recorder's
25  office within, <u>at a minimum,</u> five business days of Election Day;

26      E.      Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees
27  pursuant to, *inter alia,* 42 U.S.C. § 1988 and other applicable laws; and

28

1         F.      Granting such other and further relief as the Court deems just and proper,

2    including requiring the Secretary to accept ballots that were postmarked on or before

3    Election Day if received within, at a minimum, five business days of Election Day.

4    Dated: December 2, 2019         **PERKINS COIE LLP**

5

6                         By:   s/ Sarah R. Gonski
                         Sarah R. Gonski (# 032567)

7                             2901 N. Central Avenue, Suite 2000
                         Phoenix, Arizona 85012-2788

8                      Marc E. Elias*

9                      John Devaney*
                  Amanda R. Callais*

10                     K'Shaani O. Smith**
                  Christina A. Ford**

11                     **PERKINS COIE LLP**
                  700 Thirteenth Street NW, Suite 600

12                     Washington, D.C. 20005-3960

13                     *Admitted Pro hac vice*
                  ***Pro hac vice application to be filed*

14                     *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28