Sarah R. Gonski (Bar. No. 032567)
Alexis E. Danneman (Bar. No. 030478)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8201
Facsimile: 602.648.7000
SGonski@perkinscoie.com
ADanneman@perkinscoie.com
DocketPHX@perkinscoie.com

Marc E. Elias*
John Devaney*
Amanda R. Callais*
K'Shaani O. Smith*
Zachary J. Newkirk*
Christina A. Ford*
**PERKINS COIE LLP**
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211
melias@perkinscoie.com
jdevaney@perkinscoie.com
acallais@perkinscoie.com
kshaanismith@perkinscoie.com
znewkirk@perkinscoie.com
christinaford@perkinscoie.com

*Admitted pro hac vice*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Voto Latino Foundation, Priorities USA, and Shelby Aguallo, | No. 2:19-cv-05685-DWL |
| Plaintiffs, | |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Katie Hobbs, in her official capacity as Arizona Secretary of State, | |
| Defendant. | **ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................. 2

   A.   Arizona Relies Heavily on Voting by Mail. .............................................. 2

   B.   The Election Day Receipt Deadline Disenfranchises Thousands of Voters. ........... 3

   C.   The Election Day Receipt Deadline Has a Disproportionate Effect on Hispanic and
        Latino and Native American Voters and Voters in Rural Areas. ............................. 6

   D.   Arizona Has No Legitimate Interest in Enforcing the Receipt Deadline. ................. 9

III.    ARGUMENT .................................................................................................... 10

   A.   Plaintiffs Are Likely to Succeed on The Merits. .................................... 10

      1.   Plaintiffs Are Likely to Succeed on Their First and Fourteenth Amendments
           Claims. ....................................................................................................... 10

      2.   Plaintiffs Are Likely to Succeed on the Merits of the Procedural Due Process
           Claim. ......................................................................................................... 14

   B.   Plaintiffs Will Suffer Irreparable Harm Absent an Injunction. .............................. 15

   C.   The Balance of the Equities and the Public Interest Favor an Injunction. .............. 17

IV.     CONCLUSION .................................................................................................. 17

# TABLE OF AUTHORITIES

**CASES**

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) .................................................... 10

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ............................................................ 12, 13

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ...................................................... 10, 11, 13

*Crawford v. Marion Cty. Election Bd.,*
  553 U.S. 181 (2008) ................................................................ 11

*Democratic Nat'l Comm., et al. v. Hobbs,*
  948 F.3d 989 (9th Cir. 2020) ............................................... passim

*Doe v. Walker,*
  746 F. Supp. 2d 667 (D. Md. 2010) ........................................... 16

*Ga. Coal. for People's Agenda, Inc. v. Kemp,*
  347 F. Supp. 3d 1251 (N.D. Ga. 2018) ...................... 11, 15, 16, 17

*Ga. Coal. for the Peoples' Agenda, Inc. v. Deal,*
  214 F. Supp. 3d 1344 (S.D. Ga. 2016) ....................................... 16

*Isabel v. Reagan,*
  No. CV-128-03217, 2019 WL 5684195 (D. Ariz. Nov. 1, 2019) ................ 17

*League of Women Voters of Fla. v. Browning,*
  863 F. Supp. 2d 1155 (N.D. Fla. 2012) ....................................... 17

*League of Women Voters of Fla. v. Cobb,*
  447 F.Supp. 2d 1314 (S.D. Fla. 2006) ........................................ 16

*League of Women Voters of N.C. v. North Carolina,*
  769 F.3d 224 (4th Cir. 2014) ............................................. 11, 16

*Ne. Ohio Coal. for the Homeless v. Husted,*
  696 F.3d 580 (6th Cir. 2012) .................................................. 11

*Norman v. Reed,*
  502 U.S. 279 (1992) .......................................................... 11, 13

i

*Nozzi v. Hous. Auth. of City of L.A.*,
  806 F.3d 1178 (9th Cir. 2015) ........................................................................ 14

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) .......................................................................... 15

*One Wis. Inst., Inc. v. Thomsen*,
  198 F. Supp. 3d 896 (W.D. Wis. 2016) ............................................................ 11

*Pub. Integrity All., Inc. v. City of Tucson*,
  836 F.3d 1019 (9th Cir. 2016) ........................................................................ 11

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ..................................................................... 11, 12, 15, 17

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
  762 F. Supp. 1354 (D. Ariz. 1990) ............................................................ 14, 15

*Saucedo v. Gardner*,
  335 F. Supp. 3d 202 (D.N.H. 2018) .................................................................. 14

*Taylor v. Louisiana*,
  419 U.S. 522 (1975) ................................................................................ 15, 17

*United States v. Cunningham*,
  No. 3:08-cv-709, 2009 WL 3350028 (E.D. Va. Oct. 15, 2009) ................................ 16

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................ 10

**STATUTES**

A.R.S. § 1-218(A) ............................................................................................ 4

A.R.S. § 16-134(C)(2) ...................................................................................... 4

A.R.S. § 16-542(C) ........................................................................................... 4

A.R.S. § 16-544(A) ........................................................................................... 2

A.R.S. § 16-548(A) .................................................................................... 1, 3, 4

A.R.S. § 16-550 ........................................................................................... 9, 13

A.R.S. § 16-642(A) ....................................................................................... 9, 13

A.R.S. § 20-191 ................................................................................................ 4

Voting Rights Act Section 2 ................................................................................................ 3

**OTHER AUTHORITIES**

Ariz. Admin. Code 17-4-304 ............................................................................................ 4

Federal Rule of Civil Procedure 65 ................................................................................. 1

U.S. Const. amend. XIV, § 1 .......................................................................................... 14

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Voto Latino Foundation, Priorities USA, and Shelby Aguallo, respectfully move for an order preliminarily enjoining Secretary of State Hobbs and her respective agents, officers, employees, successors, and all person acting in concert with each or any of them, from enforcing A.R.S. § 16-548(A), and relevant portions of the 2019 Elections Procedures Manual, which has the force of law, and preliminarily enjoining them from rejecting ballots that arrive at the respective county recorder's office within, at a minimum, five business days of Election Day and contain indicia, such as a postmark, identifying those ballots as sent on or before Election Day.

## I.   INTRODUCTION

This case concerns an Arizona voting law that requires election officials to reject all ballots submitted by mail before or on Election Day simply because they arrive after 7:00 p.m. on Election Day. Since 2008, more than 17,000 lawful Arizona voters have had their ballots discarded because of this "Election Day Receipt Deadline." In one election after another, thousands of voters are arbitrarily disenfranchised by this Deadline—including Arizona's rural, Hispanic and Latino, and Native American voters who are disenfranchised at disparate rates—a result that flows from Arizona's pervasive use of voting by mail, its failure to provide clear guidance on complying with the Election Day Receipt Deadline, and factors such as unreliable mail delivery, unequal mail access, and the on-going effects of discrimination, all of which are well beyond the voters' control.

There is no legitimate state interest, much less the type of compelling interest that Arizona must show, to support this deprivation of Arizonans' most fundamental constitutional right—the right to vote. Indeed, justifications such as finality, confidence in elections, and administrative convenience fall flat, as they are directly undermined by the Election Day Receipt Deadline and are incapable of withstanding the severe burden the law imposes. Accordingly, this Court must protect the rights of Arizona voters in the upcoming November 2020 elections by preliminarily enjoining the Election Day Receipt Deadline and ensuring that all eligible Arizona voters who cast their ballot before or on Election Day have their votes counted.

1

## II.     STATEMENT OF FACTS

### A. Arizona Relies Heavily on Voting by Mail.

Arizonans have increasingly turned to voting by mail as the preferred method for exercising their constitutional right to vote. In the 2008 general election, just over a million Arizonans voted by mail.[1] Ex. 4 at 24. In 2016, nearly two million Arizonans voted by mail in the general election; more than 1.9 million did so in the 2018 midterm election. Ex. 1 at 9; Ex. 5 at 23; Ex. 6 at 29. All told, approximately 80% of Arizonans who vote in statewide elections now use mail ballots, making Arizona more dependent on voting by mail than almost any other state. Ex. 1 at 9-10 (explaining that only three states, which have all mail voting systems, exceed Arizona's mail voting rates); Ex. 6 at 29–30. The sharp increase in voting by mail in Arizona is, in part, the result of a concerted effort to encourage its use. In 2007, Arizona began maintaining a Permanent Early Voter List ("PEVL") that allows voters to automatically receive a mail ballot for every election. A.R.S. § 16-544(A). Arizona has successfully encouraged voters to sign up for PEVL. *See* Quinlan Decl. ¶ 4; *see also* Ex. 1 at 10 (95.2% of all mail voters in 2018 were on PEVL). Arizona's decision to close or move hundreds of polling places also has materially increased voters' reliance on mail ballots. *See* Quinlan Decl. ¶ 5; Ex. 2 at 10; *see also Democratic Nat'l Comm., et al. v. Hobbs*, 948 F.3d 989, 1045 (9th Cir. 2020) ("Arizona changes polling places with extraordinary frequency, and often locates them in inconvenient and misleading places.").

Of the millions of Arizonans who receive mail ballots, approximately 90% return them through the mail instead of delivering them in person. Ex. 7 at 2. While voters can drop off mail ballots in-person, multiple factors often prevent them from doing so. Many voters are unable to leave work during the limited hours that polling places are open. Ex. 2 at 27-28; *see also* Figueroa Decl. ¶ 4; Quezada Decl. ¶ 12. Some voters cannot afford the child care needed to leave their homes mid-day to deliver a ballot. *See* Quinlan Decl ¶ 11; Arias Decl. ¶ 6; *Hobbs*, 948 F.3d at 1006. Others lack transportation to drop of a ballot in

---

[1] All citations to Exhibits are materials attached to the Declaration of John Devaney.

person. *See* Quezada Decl. ¶ 11; Quinlan Decl. ¶ 11; *see also Hobbs*, 948 F.3d at 1006. Rural voters also typically live long distances from ballot drop-off locations. Ex. 2 at 18-20. College students who attend school outside their home county often must return a mail ballot in person because of the distances they would have to travel. *See* Aguallo Decl. ¶¶ 5, 8; Bixby Decl. ¶ 8; Armour Decl. ¶ 4. Additionally, many counties have few or no drop-off boxes. *See* Bixby Decl. ¶¶ 9-10. Thus, in the 2016 general election, only about 10% of Arizonans who voted by mail delivered them in-person. Ex. 7 at 2.

Legislative action also prompted the shift to mail voting. Thousands of Arizonans had, for decades, relied on ballot collection to cast their votes—giving their ballot to a trusted individual for personal delivery. *See Hobbs*, 948 F.3d at 1004-07, 1031-34. This practice was common in Arizona's minority communities; voters in Latino and Native American communities used ballot collection to overcome challenges they faced with mail-in ballots, like unreliable mail service and a lack of transportation to drop-off locations. *Id.* at 1006-07. In 2016, however, Arizona prohibited ballot collection.[2] *Id.* at 1009. In a potentially more dramatic shift, in 2019, the Legislature contemplated banning all methods of returning ballots except via mail. S.B. 1046 (2019). The bill's sponsor stated that she will re-introduce the legislation next session. With Arizona's intentional shift toward voting by mail comes a profound responsibility to have clear procedures for this voting method. *See* Ex. 2 at 10-11 (describing lack of procedures to meet deadline). But, as evidenced by the thousands of Arizonans whose mail ballots are rejected as a result of Arizona's Election Day Receipt Deadline, A.R.S. § 16-548(A), Arizona has failed to meet this responsibility.

**B. The Election Day Receipt Deadline Disenfranchises Thousands of Voters.**

Arizona has the dubious distinction of being the state in which voters are least likely be confident that their ballots will be counted. Ex. 7 at 3. Arizona voters are the most likely

---

[2] In *Hobbs*, the *en banc* Ninth Circuit struck down Arizona's ban on ballot collection, finding it had been passed with discriminatory intent and failed the results test under Section 2 of the Voting Rights Act. The mandate from *Hobbs* is currently stayed while the Attorney General petitions to the U.S. Supreme Court. Accordingly, the ban remains in place and, until the stay is lifted, will remain in place, which means that it may be in effect during the 2020 General Election.

1  to say they are "not too confident" or "not at all confident" that others' votes are counted. *Id.*

2  at 4. The Deadline, and the confusion it generates, adds to this notable lack of confidence.

3  A review of Deadline's related statutory and regulatory scheme explains voters' skepticism.

4  Election officials in each Arizona county must send mail ballots to all voters enrolled

5  in the PEVL or who request a mail ballot 24 to 27 days before an election. A.R.S. § 16-

6  542(C). The ballots must be accompanied by a postage-prepaid return envelope, an

7  affidavit, and instructions. *See* Ex. 3 at 56. To be counted, a voter's ballot and affidavit must

8  be received by 7:00 p.m. on Election Day. A.R.S. § 16-548(A). Ballots received after that

9  time are rejected, even if mailed days before the election. Ex. 3 at 56.

10  Many Arizona voters logically believe their ballot will count if mailed by Election

11  Day. *See* Aguallo Decl. ¶ 6; Johnson Decl. ¶ 5; Quezada Decl. ¶ 7; Quinlan Decl. ¶ 9;

12  Schneider Decl. ¶¶ 7-8. That belief is rooted in voters' lifetime experiences with mailing

13  deadlines. With nearly all mail-related deadlines in modern life, mail is considered timely

14  if it is postmarked by the applicable deadline. *See* Ex. 2 at 22. Postmarks are often used to

15  assess the timeliness of payments, applications, and other documents submitted to the

16  government. *Id.*; *see also* A.R.S. § 1-218(A) (tax documents); A.R.S. § 20-191 (insurance

17  premium payments); Ariz. Admin. Code 17-4-304 (vehicle registrations). Voter registration

18  applications are timely if postmarked by the registration deadline and received within five

19  days of that postmark deadline. *See* A.R.S. § 16-134(C)(2). When it comes to casting

20  ballots, however, Arizona turns voters' reasonable expectations upside down.

21  Not only is a voter's ballot rejected if postmarked before Election Day but received

22  after the Election Day Receipt Deadline, but Arizona law also effectively imposes a second

23  deadline on voters, the "Pre-Election Cutoff." This is the date by which a voter must mail a

24  ballot to have a reasonable certainty that it will be counted. While counties are now, for the

25  first time, instructed to provide guidance to voters on the Pre-Election Cutoff, Ex. 3 at 56,

26  there has been considerable inconsistency among counties on this deadline. In 2016,

27  Maricopa publicized this deadline as Tuesday, November 1 while Pima publicized it as

28  Thursday, November 3. *See* Exs. 13 at 2 & 15 at 1. Equally problematic, the Pre-Election

4

1    Cutoff is inconsistent from election to election even within the same county. In Pima, the

2    suggested deadline in 2014 was four days before Election Day; in 2016, it changed to five

3    days; and in 2018, it was six days. Ex. 2 at 11-12; *see also* Ex. 13 at 2. In 2018, Pima

4    bewilderingly promoted two different recommended Pre-Election Cutoffs. Ex. 13 at 3, 6. In

5    Maricopa, the 2016 mailing deadline was seven days before the general election; for 2018,

6    it was six days. Ex. 2 at 11; Ex. 15. In Yuma, the 2018 recommendation was six days; in

7    2020, Yuma is directing voters to mail their ballots "well in advance of the deadline date."

8    Ex. 2 at 12; Ex. 14 at 5. Other counties suggest mailing ballots as much as ten days before

9    the election. Ex. 2 at 12-13; Ex. 16. Given these inconsistent deadlines, it is hardly

10   surprising that Arizonans lack confidence their votes will be counted and are confused about

11   when to mail ballots. It is unlikely that providing new guidance, *see* Ex. 3 at 56, will remedy

12   this confusion. *See* Ex. 2 at 19, 31.

13        In view of the confusion created by the Election Day Receipt Deadline and the ever-

14   shifting Pre-Election Cutoff, it is no wonder that thousands of Arizonans have their ballots

15   rejected. Between the 2008 and 2018 General Elections, Arizona rejected at least 17,463

16   ballots for arriving after the Election Day Receipt Deadline.[3] Ex. 1 at 42 (Table C). In 2008,

17   at least 1,611 ballots were rejected, even though many of them were mailed days before

18   Election Day. *Id.* In 2012, more than double that number—4,107 ballots—were rejected.

19   *Id.* And in the 2018 midterm election, a lower turnout general election than either 2008 or

20   2012, more than 3,000 ballots were rejected. *Id.* Many of these ballots would have been

21   counted if Arizona had accepted ballots postmarked on or before Election Day.[4]

22        Arizona's rejection of these ballots has serious consequences for disenfranchised

23   voters and for elections: in every election year, dozens of races are decided by margins of

---

[3] This figure, as with all aggregate figures cited herein, undercount the actual number of ballots rejected, as many counties do not maintain records of these rejections. Ex. 1 at 6-8. Likewise, there is no way to account for the individuals who do not mail their ballots at all because they missed the Pre-Election Cutoff and assumed they had missed the actual deadline or assumed their ballots would arrive after Election Day.

[4] The use of the term "postmark" is intended to encompass any indicia, such as a barcode or other marking, made by the U.S. Postal Service to track or record the time that a ballot entered the postal system.

mere hundreds or even a few dozen votes. Ex. 1 at 25-26. In the 2018-2019 election season, there were at least thirteen races in Cochise, Mohave, Navajo, and Santa Cruz in which the margins were less than the number of late mail-in ballots rejected. Ex. 1 at 26-27. In 2016, in the Republican primary for Arizona's 5th Congressional District ("CD5"), the margin was only 27 votes, which is significantly less than the average number of late mail-in ballots rejected in Maricopa County, where CD5 is located. Ex. 9; Ex. 10; *see also* Ex. 1 at 26. And in 2010, Proposition 112 passed by just 194 votes statewide, Ex. 1 at 25, while Maricopa County alone rejected more than 2,680 late mail-in ballots.[5] *Id.* at 42 (Table C).

Finally, by forcing voters to send their ballots in a week to ten days before Election Day, the Deadline deprives voters of information that arises in the election's last week. *See* Ex. 2 at 40-41; Aguallo Decl. ¶¶ 10-11; Arias Decl. ¶¶ 9-10; Johnson Decl. ¶ 8. Campaigns and voters often consider the final week as critical for canvassing and other get-out-the vote activities. *See* Sutton Decl. ¶¶ 7-8; Quinlan Decl. ¶ 7; Schneider Decl. ¶ 7; Ex. 1 at 12; Ex. 2 at 16-17. In addition, late-breaking news can change a race's landscape. *See* Ex. 2 at 38-39; *see also* Sutton Decl. ¶ 5. Voters reasonably expect to be able to evaluate candidates and issues up to Election Day. *See* Aguallo Decl. ¶¶ 10-11; Arias Decl. ¶¶ 9-10; *see also* Ex. 1 at 12; Ex. 2 at 38-39. Indeed, history is replete with examples of elections that were affected by late-breaking developments days before an election.[6] *See* Ex. 2 at 38-39.

## C. The Election Day Receipt Deadline Has a Disproportionate Effect on Hispanic and Latino and Native American Voters and Voters in Rural Areas.

The Election Day Receipt Deadline is particularly harsh on Arizona's minority voters, who comprise a disproportionately significant portion of citizens whose ballots are rejected. Ex. 1 at 28. In Maricopa, the Deadline is four times more likely to disenfranchise

---

[5] Other examples of such elections are present in nearly every election cycle. *See* Ex. 1 at 25-26.

[6] For instance, in the 2016 presidential preference election, Senator Marco Rubio withdrew from the race before Election Day, yet, received 72,304 votes, thousands of which were no doubt cast by Arizonans who mailed their ballots before Rubio's announcement in order to comply with the Election Day Receipt Deadline. Ex. 11 at 2. Five days before the 2000 presidential election, then-Governor George W. Bush acknowledged a DUI conviction, thereby losing millions of evangelical votes, according to advisor Karl Rove. Ex. 8 at 241.

Hispanic and Latino voters, and Native American voters are 5.5 times more likely to be disenfranchised. Ex. 1 at 28-29. In rural counties like Cochise, Coconino, Graham, Greenlee, and Santa Cruz, Hispanic and Latino voters are 4.2 times more likely to be disenfranchised. *Id*. at 23. In counties with large Hispanic and Native American populations—Apache, Santa Cruz, Yuma, Navajo, and Greenlee—the late rejection rate is 6.12 for every 1000 mail ballots. *Id*. at 19. Santa Cruz, where 83% of the population is Hispanic/Latino, has the highest rate of late-rejected ballots: 7.6 rejections for every 1000 mail ballots counted. *Id*. at 11; *but see infra* at 8 (Maricopa County's rejection rate).

The reasons for this disparity are varied, but each is traceable to Arizona's long history of discrimination against minority voters. Ex. 2 at 28-31. As the Ninth Circuit recently found, "Arizona has a long history of race-based discrimination against its American Indian [and] Hispanic [] citizens. Much of that discrimination is directly relevant to those citizens' ability to register, to vote, or otherwise to participate in the democratic process." *Hobbs*, 948 F.3d at 1017. The fall-out from this sad history is pervasive and is found in the persistent education gaps that have left Arizona's minority voters less educated than their white counterparts, which makes them less likely to be aware of the Deadline.[7] Ex. 2 at 32-33; Ex. 17. The Ninth Circuit recognized this in *Hobbs*, explaining that "[d]ue to their lower levels of [English] literacy and education, minority voters are more likely to be unaware of certain technical [voting] rules, such as the requirement that early ballots be received by the county recorder, rather than merely postmarked, by 7:00 p.m. on Election Day." *Hobbs*, 948 F.3d at 1028 (quotation marks omitted and alterations in original). Coupled with lower levels of education are high rates of poverty among Hispanics (20%) and Native-Americans (35%) in Arizona as compared to Whites. Ex. 2 at 27. And poverty's burdens limit minority voters' access to reliable transportation and flexible work schedules, making mail delivery of ballots their only realistic option. Ex. 2 at 17-18. The lower levels

---

[7] Hispanics and Native Americans are less likely to graduate high school in Arizona than whites. Ex. 2 at 32. Since at least 2005, studies have shown consistent racial disparities among Hispanic and Native language minorities in all categories of testing. *Id*. at 33.

of education, along with bans on bilingual education, also create language challenges for Hispanic and Native American voters in understanding instructions about the Election Day Receipt Deadline. Ex. 2 at 34. Relatedly, Spanish-speaking voters in Arizona historically have received incorrect and misleading information—including wrong election dates—from election officials. *Hobbs*, 948 F.3d at 1025.

The Election Day Receipt Deadline also particularly disenfranchises Arizonans in rural counties. The most populous counties in Arizona have lower incidences of rejected late mail ballots than less populous counties. For example, Maricopa and Pima rejected ballots at rates of 1.3 and 2.05 per 1000 mail ballots, respectively, in 2018. Ex. 1 at 30. In contrast, the rejection rate in Navajo, Cochise, and Santa Cruz were 5.82, 6.65, and 7.63, respectively. *Id.* The same pattern persisted in 2016. *Id.* While Maricopa rejected late ballots at a rate of 1.23 per 1000 mail ballots, Navajo rejected 20.8 mail ballots per every 1000. *Id.* at 12. In rural areas, mail service is unreliable and slow. *See* Johnson Decl. ¶¶ 6-7. Instead of going directly from one rural address to another nearby address, mail is re-routed through a central processing facility in Phoenix, which increases delivery times. *See* Ex. 2 at 15; Ex. 16. In addition, rural voters often do not have home mailboxes and do not receive personal mail delivery services. Ex. 2 at 26-27; *see also Hobbs*, 948 F.3d at 1006-07, 1034. Instead, they must travel to a post office miles away from where they live, to pick up and drop off mail. Ex. 2 at 27-28; *see also Hobbs*, 948 F.3d at 1006. Many of these voters are unable to visit post offices with regularity. Ex. 2 at 19; *see also Hobbs*, 948 F.3d at 1006. It is particularly difficult for rural voters to pick up ballots at a post office a few weeks before an election and then drop them off shortly thereafter to meet the Deadline.

Rural Arizona also contains many communities that are predominately populated by minority voters, compounding the effects of the Deadline on those voters. As the Ninth Circuit recently explained, "[r]eady access to reliable and secure mail service is nonexistent" in some of these communities. *Hobbs*, 948 F.3d at 1034 (quotation and citation omitted). Native American voters, in particular, struggle with mail service because of, among other things, a severe lack of postal service infrastructure. *See id.* at 1006. Rural

Latino voters face similar problems in accessing secure, reliable mail service. *Id.* In *Hobbs*, the Ninth Circuit found that in heavily Hispanic San Luis and Somerton, voters often lack home delivery mail service or live miles from the post office.[8] *Id.* Given the travel distances, visits to the post office are infrequent. *Id.*

### D. Arizona Has No Legitimate Interest in Enforcing the Receipt Deadline.

Arizona law gives county election officials 20 days post-election to count votes and certify results. A.R.S. § 16-642(A). This is among the longest post-election periods in the country. *See* Ex. 18. Arizona law also recognizes that some ballots may be incomplete when voters submit them and provides voters up to five business days—a full calendar week—after an election to cure them. *Id.* § 16-550; *see also* Ex. 2 at 20. County officials also have up to ten days after Election Day to process provisional ballots. *Id.* § 16-135(D); *see also* Ex. 2 at 20. Because of these provisions, Arizona has a well-known history of not certifying election results until many days or even weeks after Election Day. *See* Exs. 19, 20.

Given Arizona's statutorily-based history of not finalizing vote tallies and certifying elections until after Election Day, there is no valid reason for rejecting ballots postmarked on or before Election Day that arrive a few days after the election. Ex. 2 at 20. The purported justification for the Deadline is to ensure that all votes are counted and elections are certified within a reasonable time. *Id.* at 41-42. By law, a reasonable time is within 20 days of an election and, in practice, Arizona election officials have typically certified election results within approximately two weeks of an election. Exs. 19, 20. Neither of these timeframes would be threatened—and Arizona could avoid disenfranchising thousands of voters—if election officials were required to accept ballots *postmarked* by Election Day and received within a reasonable time—at least five business days—thereafter. The five-business day cure period for incomplete ballots demonstrates that Arizona law already recognizes that a similar period does not compromise its interest in certifying elections as final. Ex. 2 at 20.

---

[8] In San Luis, which is 98% Hispanic, nearly all the city's residents must rely on a single post office located across a major highway to send and receive mail, even though the vast majority of San Luis' residents lack reliable transportation. *Id.*

1    Further, one elections administrator who has overseen elections in several states that

2    use postmark deadlines explains that reliance on postmarks provides certainty and increases

3    voters' confidence in elections. *See* Konopasek Decl. ¶¶ 5, 11. Postmark deadlines also do

4    not increase administrative burdens, even in jurisdictions that rely heavily on voting by

5    mail. *See id.* ¶¶ 6-8. By contrast, a *receipt* deadline creates more administrative burdens;

6    administrators must coordinate with the Postal Service to arrange for the physical handoff

7    of ballots in every postal location on Election Day and must ensure "late" ballots do not

8    become intermingled with other ballots. *See id.* ¶¶ 8-9.

### III.   ARGUMENT

10    To succeed on a motion for preliminary injunction, Plaintiffs must demonstrate that:

11    (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm

12    absent an injunction, (3) the balance of the equities tip in their favor, and (4) an injunction

13    serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

14    These elements are balanced on a sliding scale, and a preliminary injunction is appropriate

15    if Plaintiffs demonstrate "that serious questions going to the merits were raised and the

16    balance of hardships tips sharply in plaintiff's favor." *All. for the Wild Rockies v. Cottrell*,

17    632 F.3d 1127, 1134–35 (9th Cir. 2011) (citations omitted).

**A. Plaintiffs Are Likely to Succeed on The Merits.**

**1.    Plaintiffs Are Likely to Succeed on Their First and Fourteenth Amendments Claims.**

21    Arizona's Election Day Receipt Deadline arbitrarily disenfranchises thousands of

22    voters—and particularly Arizona's rural, Hispanic and Latino, and Native American

23    voters—by unduly and severely burdening their right to vote. Under the *Anderson/Burdick*

24    balancing test, the Supreme Court requires courts to "weigh 'the character and magnitude

25    of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise

26    interests put forward by the State as justifications for the burden imposed by its rule,'"

27    considering "'the extent to which those interests make it necessary to burden the plaintiff's

28    rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*,

10

460 U.S. 780, 788–89 (1983)). This inquiry is highly fact-specific and may not be undertaken by rote. Rather, the court applies a "flexible standard." *Id.* When voting rights are severely restricted, a law "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992). But even less severe burdens remain subject to balancing: "[h]owever slight" the burden on voting rights may appear, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288–89). In evaluating the burden a law imposes, a court must focus on both the burden on the general electorate and the effect on the actual individuals affected by the law. *Id.* at 201; *see also Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 n.2 (9th Cir. 2016).

It is well-established that disenfranchisement severely burdens the right to vote—and that even disenfranchising a small number of voters can give rise to a severe burden. *See, e.g.*, *League of Women Voters of N.C. ("LOWV") v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("[T]he possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration to the plaintiffs' challenges."); *Ne. Ohio Coal. for the Homeless ("NEOCH") v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012).

The Election Day Receipt Deadline disenfranchises thousands of eligible voters who cast their ballot on or before Election Day, simply because their ballots do not arrive by 7:00 p.m. on Election Day. There can be no question that preventing this many Arizonans from having their votes counted severely burdens the right to vote. In fact, courts have regularly found a severe burden where voting laws disenfranchised far fewer voters than the number of Arizonans disenfranchised here. *See, e.g.*, *NEOCH*, 696 F.3d at 593, 597 (disqualifying provisional ballots that constituted less than 0.3% of total votes inflicted "substantial" burden on voters); *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018) (finding severe burden where 3,141 individuals ineligible to register); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 948–49 (W.D. Wis. 2016)

1   (finding severe burden when less than 100 qualified voters were disenfranchised).

2        While the burden for Arizona's general electorate is severe, it is particularly severe

3   for rural, Latino and Hispanic, and Native American voters, all of whom are disparately

4   likely to be disenfranchised due to the Deadline. *See supra* at 6-9. Rural Arizona voters are

5   more likely to experience unreliable and delay-ridden mail service. *Id.* at 8. Not only is it

6   more likely that their ballots will arrive after the Deadline, but it is harder for these voters

7   (and their local election officials) to properly estimate the Pre-Election Cutoff, placing these

8   voters at a severe disadvantage with respect to voters in more urban counties. *Id.* Given the

9   uncertainty surrounding mail delivery, rural voters have no way to guarantee that mailing

10  their ballots even in the recommended time period before Election Day will ensure that they

11  arrive on time—and the evidence indicates that it is typical for ballots in some counties to

12  take much longer to arrive. *Id.* The only solution then is for rural voters to mail their ballots

13  far earlier than voters in non-rural areas, depriving them of new information that arises in

14  the election's final days. *See supra* at 6-9. This knowledge deficit interferes with rural

15  voters' ability to cast a fully informed vote, placing additional, disproportionate burdens on

16  their right to vote. *See Anderson*, 460 U.S. at 798 ("A State's claim that it is enhancing the

17  ability of its citizenry to make wise decisions by restricting the flow of information to them

18  must be viewed with some skepticism.").

19       The burden on Latino, Hispanic, and Native American voters generally, and

20  particularly those who live in rural counties, is further compounded by the effects of

21  Arizona's long history of discrimination against these populations: lower levels of

22  education and literacy, higher levels of poverty, language barriers, and decreased access to

23  transportation. *See supra* at 7-8. These factors, combined with the uncertainties surrounding

24  the Pre-Election Cutoff and compromised access to reliable mail service, make it especially

25  difficult for these voters to ensure that ballots—cast prior to Election Day—are also

26  delivered by the Election Day Receipt Deadline. *Id.* The resulting disproportionate effect is

27  indisputable and material to measuring the burden they face under *Anderson-Burdick*.

28  Because the resulting burdens on voters as a whole—and rural, Latino, Hispanic, and Native

American voters in particular—are severe, the Election Day Receipt Deadline must be narrowly drawn to advance a state interest of compelling importance. *Norman*, 502 U.S. at 280. It plainly fails this test.

No "precise interest" Arizona articulates can justify the burdens the Deadline inflicts on its voters. *Anderson*, 460 U.S. at 789. While the state has an interest in ensuring the finality of elections, rejecting validly cast ballots that happen to arrive after 7:00 p.m. on Election Day does not serve that interest. As described, A.R.S. § 16-642(A) firmly establishes that finality for this purpose is 20 days after an election, not Election Day; Arizona election officials therefore regularly count votes after Election Day, and typically do not certify election results until weeks thereafter. *See supra* at 9-10. Given this law and practice in Arizona, there is hardly "a state interest of compelling importance" in rejecting all mail-in ballots that arrive after 7:00 p.m. on Election Day.

The ten-day period for processing provisional ballots and the five-business day period for curing mail-in ballots further undercuts any compelling state interest. *See supra* at 9-10. If there were such an interest in receiving all valid ballots by Election Day, Arizona law would not provide for this week-long cure period. Indeed, its existence proves that the Election Day Receipt Deadline is not "narrowly drawn." *Burdick*, 504 U.S. at 434. The cure period demonstrates that the state's interest in certifying and finalizing election results within 20 days of Election Day can be accomplished without imposing an Election Day Receipt Deadline. A narrowly tailored deadline would allow for at least the five business days A.R.S. § 16-550 provides, avoiding disenfranchising thousands of voters.

The state's interest in increasing confidence in elections also cannot justify the Election Day Receipt Deadline. The Deadline injects significant uncertainty into the voting process; neither voters nor election officials can accurately predict the Pre-Election Cutoff for mailing a ballot to ensure the ballot arrives on time. *See supra* at 4-5. In turn, this uncertainty causes voters to lose confidence in Arizona's election system, leading them to believe that lawful voters' ballots will not be counted. *Id.* at 4. In rural areas especially, the Deadline leads voters to conclude they have less time than voters elsewhere to evaluate

candidates and issues before mailing their ballots. *Id*. at 6-9. The Deadline is not narrowly tailored—or even remotely linked—to increasing confidence in elections.

### 2. Plaintiffs Are Likely to Succeed on the Merits of the Procedural Due Process Claim.

Plaintiffs are also likely to succeed on their procedural due process claim. Arizona cannot deprive any person of liberty without "due process of law," U.S. Const. amend. XIV, § 1. The Election Day Receipt Deadline does just that. Courts must first consider "the nature of the interest that will be affected by the official action, and in particular, to the 'degree of potential deprivation that may be created.'" *Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1192–93 (9th Cir. 2015) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 341 (1976)). Next, "courts must consider the 'fairness and reliability' of the existing procedures and the 'probable value, if any, of additional procedural safeguards.'" *Id*. at 1193 (quoting *Mathews*, 424 U.S. at 343). Finally, "courts must assess the public interest, which 'includes the administrative burden and other societal costs that would be associated with' additional or substitute procedures." *Id*. (quoting *Mathews*, 424 U.S. at 347).

Each of these factors weighs heavily in Plaintiffs' favor here. *First*, the right to vote is unquestionably a liberty interest and cannot be "confiscated without due process." *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1357 (D. Ariz. 1990). This liberty interest extends to mail voting in Arizona, which is statutorily conferred. *See, e.g.*, *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 215 (D.N.H. 2018) ("voter has a sufficient liberty interest once 'the State permits voters to vote absentee.'") (quoting *Zessar v. Helander*, 2006 WL 642646, at *5 (N.D. Ill. Mar. 13, 2006)).

*Second*, the degree of deprivation resulting from the Election Day Receipt Deadline is extraordinarily high. This deprivation is neither hypothetical nor speculative; it is established by public data from Arizona counties showing that thousands of voters' mail-in ballots have been rejected in every general election since at least 2008. *See* Ex. 1 at 42 (Table C). These data also confirm the disproportionate effect the Deadline has on rural, Latino, Hispanic, and Native American voters. *Id.* at 28-29. Moreover, once a voter's ballot

1   arrives after the Deadline and their liberty interest is deprived, "the election procedures do
2   not give some form of post-deprivation notice to the affected individual so that any defect
3   in eligibility can be cured and the individual is not continually and repeatedly denied so
4   fundamental a right." *Raetzel*, 762 F. Supp. at 1358; *see also* Figueroa Decl. ¶ 7; Johnson
5   Decl. ¶ 4. Thus, the Election Day Deadline Receipt can deprive the same voters of their
6   rights repeatedly because there is no post-deprivation notice to voters that their ballot was
7   not counted. *Raetzel*, 762 F. Supp at 1358 ("The disqualified voter may never ascertain the
8   justification for the rejection of their vote in order to cure the defect for future eligibility.").

9       *Third*, the Election Day Receipt Deadline is neither fair nor reliable. The Pre-
10  Election Cut-Off that results from the Deadline varies from county to county and from one
11  election to another, making it patently unreliable, and confusing to voters. At best, these
12  projected mail dates are rough estimations as to when voters should mail their ballots;
13  unforeseeable events can impact the timing, such as mail delivery times and routes, traffic
14  accidents, and weather. Likewise, given the disparities in the impact of the Election Day
15  Receipt Deadline there is also no question that it is unfair. *See supra* at 6-9. This is
16  particularly true given that impacted voters are not only eligible to vote, but have all made
17  the effort to complete and cast their ballot prior to Election Day, but are disenfranchised
18  because the ballot arrives late, a factor over which they have little to no control. *Id.* at 3-6.

19      *Finally*, the public interest favors procedures protecting voting rights. The Supreme
20  Court has emphasized that the public has a "strong interest in exercising the fundamental
21  political right to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). As outlined above, none
22  of the justifications Arizona can proffer overcome that interest; administrative ease cannot
23  impinge on the fundamental right at stake here and, as a result, the Election Day Receipt
24  Deadline violates the Due Process Clause of the Fourteenth Amendment. *Taylor v.
25  Louisiana*, 419 U.S. 522, 535 (1975) ("administrative convenience" cannot justify practices
26  that impinge upon fundamental rights); *see also Kemp*, 347 F. Supp. 3d at 1268.

27              **B. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction.**

28      Disenfranchisement constitutes irreparable injury. *Obama for Am. v. Husted*, 697

F.3d 423, 436 (6th Cir. 2012); *LOWV*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury.") (citations omitted). Once the election comes and goes, "there can be no do-over and no redress." *LOWV*, 769 F.3d at 247. Here, as has occurred in every general election for the past decade, the mail-in ballots of thousands of voters—including those of Voto Latino and Priorities' constituents and likely Plaintiff Aguallo's—will not be counted in the November 2020 election because of the Election Day Receipt Deadline. There will be no second chance for them to exercise their most basic constitutional right and, consequently, the harm to them is irreparable. *See, e.g.*, *Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016) (granting preliminary injunction to extend registration deadline and observing "an individual's loss of the right to vote is clearly an irreparable injury that outweighs any damage caused by extending the deadline"); *Doe v. Walker*, 746 F. Supp. 2d 667, 677 (D. Md. 2010) (extending deadline to count votes after UOCAVA challenge); *United States v. Cunningham*, No. 3:08-cv-709, 2009 WL 3350028, at *4 (E.D. Va. Oct. 15, 2009) (same). Indeed, Plaintiff Aguallo, who was disenfranchised as a result of the Deadline in 2018, faces a substantial risk of disenfranchisement again as she must again cast a mail ballot in 2020 under virtually the same circumstances as she did in 2018. Aguallo Decl. ¶¶ 5-10.

Moreover, every day that the Deadline is in effect, Plaintiffs Priorities USA and Voto Latino are irreparably harmed by having to divert resources to help their constituencies overcome the burden imposed by the law and to effectuate their missions. *See, e.g.*, *Kemp.*, 347 F. Supp. 3d at 1268 (finding irreparable harm where plaintiff's organizational mission would be harmed and it would have to engage in additional voter registration and mobilization efforts); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1339 (S.D. Fla. 2006) (same). Indeed, the Deadline directly impacts Priorities USA's mission of turning out Latino, Hispanic, and Native American voters in Arizona. Cecil Decl. ¶ 4. If the law remains in effect, Priorities USA must divert resources otherwise spent on issue and candidate advocacy to building and executing a campaign to educate voters about the Deadline. Cecil Decl. ¶¶ 5-10. Similarly, Voto Latino, an organization focused on giving a

16

voice and the vote to Latino and Hispanic citizens, will have to divert resources from activities such as its voter registration campaign in Arizona to educate current voters about the Deadline. Kumar Decl. ¶¶ 9-13. Thus, Plaintiffs have demonstrated irreparable harm.

### C. The Balance of the Equities and the Public Interest Favor an Injunction.

The balance of the equities favor Plaintiffs. On the one hand, there is the vindication of the fundamental right to vote—a right this Court "wholeheartedly agrees" is both "precious" and "fundamental." *Isabel v. Reagan*, No. CV-128-03217, 2019 WL 5684195, at *5 (D. Ariz. Nov. 1, 2019) (citations omitted). On the other hand, Arizona would only be restrained from enforcing a ballot-counting deadline that is not necessary to protect the finality of elections, decreases voter confidence and certainty, will not result in any administrative burdens, but has resulted in recurring disenfranchisement. Any harms to balance on the state's side are either non-existent or *de minimis* compared to the severe harm Plaintiffs and thousands of Arizona voters face. *See, e.g.*, *Taylor*, 419 U.S. at 535; *Kemp*, 347 F. Supp. 3d at 1268. Finally, issuing the requested injunction would be in the public interest. Indeed, "[t]he vindication of constitutional rights . . . serve[s] the public interest almost by definition," including specifically when the right at issue is the right to vote. *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012). This is because the public has a "strong interest in exercising the fundamental political right to vote." *Purcell*, 549 U.S. at 4. Here, thousands of Arizona voters' ballots will count and their voices—which they will have already exercised before Election Day—will be heard if the Court enjoins the Election Day Receipt Deadline. This plainly weighs in the public interest and in favor of an injunction.

### IV.   CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction as set forth in the proposed order.

17

1

Dated: February 25, 2020

*s/* Alexis E. Danneman

2

Alexis E. Danneman (# 030478)
Sarah R. Gonski (# 032567)

3

**PERKINS COIE LLP**

2901 North Central Avenue, Suite 2000

4

Phoenix, Arizona 85012-2788

5

6

Marc E. Elias*
John Devaney*

7

Amanda R. Callais*
K'Shaani O. Smith*

8

Zachary J. Newkirk*

9

Christina A. Ford*

**PERKINS COIE LLP**

10

700 Thirteenth Street NW, Suite 800
Washington, D.C. 20005-3960

11

12

*Admitted pro hac vice*

13

*Attorneys for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2   I hereby certify that on February 25, 2020, I electronically transmitted the attached

3 document to the Clerk's Office using the CM/ECF System for filing.

4

5           *s/ Michelle DePass*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28