Sarah R. Gonski (Bar. No. 032567)
Alexis E. Danneman (Bar. No. 030478)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8201
Facsimile: 602.648.7000
SGonski@perkinscoie.com
ADanneman@perkinscoie.com
DocketPHX@perkinscoie.com

Marc E. Elias*
John Devaney*
Amanda R. Callais*
K'Shaani O. Smith*
Zachary J. Newkirk*
Christina A. Ford*
**PERKINS COIE LLP**
700 Thirteenth Street NW, Suite 800
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211
melias@perkinscoie.com
jdevaney@perkinscoie.com
acallais@perkinscoie.com
kshaanismith@perkinscoie.com
znewkirk@perkinscoie.com
christinaford@perkinscoie.com

*Admitted pro hac vice*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Voto Latino Foundation, Priorities USA, and Shelby Aguallo,<br><br>Plaintiffs,<br><br>v.<br><br>Katie Hobbs, in her official capacity as Arizona Secretary of State,<br><br>Defendant. | No. 2:19-cv-05685-DWL<br><br>**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES RELATED TO COVID-19 IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Voto Latino Foundation, Priorities USA, and Shelby Aguallo, submitted a Memorandum of Law in Support of their Motion for a Preliminary Injunction on February 25, 2020. In the six weeks since that filing, the COVID-19 crisis has drastically changed how Arizona will be able to conduct elections moving forward. Plaintiffs submit this Supplemental Memorandum of Law not to repeat their original arguments, but to provide the Court with facts and analysis demonstrating how the COVID-19 crisis impacts this case and Arizona's ability to conduct elections in a constitutionally permissible manner. Indeed, as mail balloting grows in Arizona and the potential for postal delays increases due to COVID-19, it is all the more important that Arizona allow mail ballots that are mailed by the voter on or before Election Day to be counted to ensure that thousands of voters are not disenfranchised.

## I.   INTRODUCTION

The United States is in the throes of an unprecedented crisis. A highly infectious coronavirus, which causes the dangerous and often deadly disease COVID-19, is rapidly spreading throughout the country. As of the date of this filing, Arizona has over 3,000 reported cases of COVID-19, a number that is rapidly increasing. This crisis has no clear end in sight. The latest projections indicate that it will persist into the fall and that social distancing may be required for the next 18 months, until a vaccine is developed and distributed. *See* Ex. 3 (projection from federal government); Ex. 4 (projection from scientists).

Because of this crisis, Arizona has already been forced to make significant changes to its primary elections, including closing a substantial number of in-person voting locations in the recent presidential preference election ("PPE"). Moving forward, Defendant Secretary of State Hobbs (the "Secretary") has asked the Arizona State Legislature to convert the 2020 Primary and General Elections to all-mail elections to protect Arizonans' health and ensure that voters are not required to choose between exercising their fundamental right to vote and contributing to the spread of the virus—a change many other states have already made for upcoming elections. Nationally, due to social distancing

practices, the country has already seen voluntary shifts toward voting by mail that are likely to replicate themselves in Arizona. In fact, Arizona saw a marked increase in voting by mail during the March 17, 2020 PPE, which took place during the early stages of the crisis, with 90 percent of ballots being cast by mail.

At the same time, the United States Postal Service (USPS) is facing a budget crisis that will likely lead to delays in mail delivery, raising particular concerns for Arizona which already experiences slow and unreliable mail service and, as a result, has had to ask voters to mail their ballots up to 10 days before Election Day even before COVID-19. Together, these circumstances guarantee that as the COVID-19 crisis continues, Arizona voters will find it increasingly difficult to ensure that their ballots arrive before 7:00 p.m. on Election Day (the "Election Day Receipt Deadline"). Arizona cannot continue to reject mail ballots that are mailed on or before Election Day but received after the Election Day Receipt Deadline without disenfranchising a significant number of its voters.

Federal courts have an ongoing duty, especially in times such as these, to ensure that voters can exercise their fundamental right to vote. Just last week, the U.S. Supreme Court allowed a district court's extension of Wisconsin's Election Day Receipt Deadline to stand provided that ballots were postmarked by Election Day to ensure that Wisconsin voters were not disenfranchised by the Election Day Receipt Deadline. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, No. 19A1016, 2020 WL 1672702 (U.S. Apr. 6, 2020). This Court should do the same and protect the rights of Arizona voters in the upcoming November 2020 Election by preliminarily enjoining the Election Day Receipt Deadline and ensuring that all eligible Arizona voters who cast their ballot on or before Election Day have their votes counted.

## II.  BACKGROUND

Arizona has not been spared from the COVID-19 crisis. Today, the State has over 3,000 reported cases and counting. *See* Ex. 2. On March 11, 2020, Governor Ducey declared a state of emergency, recognizing that COVID-19 "poses a serious public health threat for infectious disease to spread to Arizona residents and visitors if proper precautions

recommended by public health are not followed." Ex. 5. Since that emergency declaration, Governor Ducey has activated the Arizona National Guard to protect the food supply, closed schools for the remainder of the school year, suspended the requirement to renew a drivers' license in-person at statewide government agencies, and most recently issued a Stay-At-Home Order. *See* Ex. 6; Ex. 7; Ex. 8. In addition, the Navajo Nation, with an Arizona population of more than 100,000, has issued a shelter-in-place order and curfew for all residents. *See* Ex. 9; Ex. 10.

This crisis is not something that will be resolved "in a day or a week," Ex. 11, but now is expected to last many months and likely well into 2020 General Election cycle. The federal government has announced that it is preparing for the COVID-19 crisis to last 18 months, and has warned that the pandemic could come in "multiple waves." Ex. 3. Recently, the White House's coronavirus advisor and the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci, was asked at a White House press conference whether the United States was "prepared for [coronavirus] to strike again, say, in the fall?" Ex. 12. Dr. Fauci responded that, "[i]n fact I would anticipate that that would actually happen because of the degree of transmissibility." *Id.* Similarly, the Director of the National Center for Immunization and Respiratory Diseases at the CDC, Dr. Nancy Messionnier, said in March 2020 that she expected the virus to continue spreading in the United States until next year. *See* Ex. 13. These sentiments are also shared by scientists outside the United States government. The COVID-19 Response Team at the Imperial College of London has estimated that social distancing and other preventative measures will be required until a vaccine is developed and distributed widely, which they predict could take "18 months or more." Ex. 4. Even if the community spread of COVID-19 in Arizona has significantly decreased by this upcoming election season, CDC guidelines recommend that individuals take meaningful social distancing measures even if there is a "minimal" threat of community transmission of COVID-19 in the area. Ex. 14. This guidance is necessitated by the reality that asymptomatic carriers appear to be contributing significantly to community spread, and until there is a vaccine or widespread "herd immunity" (i.e., at least 60% of the

3

1  population has been infected and recovered), Americans will remain at serious risk of
2  contracting this unpredictable and deadly virus. *See* Ex. 15.

3        The Secretary, recognizing the likelihood that this crisis will last months and affect
4  the 2020 Primary and General Elections, has asked the Legislature to implement legal
5  changes to Arizona's election laws in anticipation of that eventuality. *See* Ex. 16. Secretary
6  Hobbs is right to seek changes. The CDC, anticipating difficulties in conducting elections
7  during the COVID-19 crisis, has now recommended that jurisdictions encourage voting by
8  mail and reduce methods of voting that lead to direct contact with other voters or poll
9  workers. *See* Ex. 17. Other federal, state, and local officials have increasingly come to the
10 same realization. Congress, for example, recently authorized $400 million to help states
11 transition to voting-by-mail. *See* Ex. 18.

12       To date, at least fifteen states and Puerto Rico have been forced to postpone their
13 primary elections to avoid public health risks posed by the virus. *See* Ex. 19. States that
14 have not postponed their elections and attempted to conduct in-person voting have seen
15 utter chaos result. In Wisconsin, for example, Milwaukee was forced to reduce its polling
16 locations from 180 to just five locations because of a severe shortage of poll workers,
17 leading to several hour-long lines at the polls and forcing voters to decide whether to risk
18 their health to cast their ballot. *See* Ex. 20. The inherent challenges to voting in-person
19 during this pandemic led voters in Wisconsin to request absentee ballots at unprecedented
20 rates. *See* Ex. 21 (showing more than a million voters requested absentee ballots for the
21 recent primary, four times the number who did so in the 2016 General Election). This
22 increased interest in voting by mail, combined with decreases in available elections staff
23 and other social distancing efforts, placed a significant strain on local election boards,
24 several of which were not able to send voters a ballot in time for it to be returned—or even
25 delivered to them—by the normal Wisconsin Election Day Receipt Deadline. *See*
26 *Democratic National Comm. v. Bostelmann*, No. 20-cv-249-wmc, 2020 WL 1638374, at
27 *38-39 (W.D. Wis. Apr. 2, 2020). This crisis ultimately necessitated federal litigation that
28 reached the U.S. Supreme Court and resulted in the implementation of a postmark rule,

whereby ballots postmarked by Election Day could be counted as long as they are received within six days of Election Day. *See Republican Nat'l Comm.*, 2020 WL 1672702, at *2.

Like Wisconsin, Arizona did not postpone its March 17, 2020 PPE, and counties' election operations were acutely affected by the crisis, despite the fact that the crisis was just beginning in Arizona. For example, while Yuma, Navajo, and Gila Counties managed to keep polling locations open, election officials pleaded with voters to maintain distance from other voters or election workers and to sanitize their hands before and after dropping off or casting a ballot. *See* Ex. 22. Coconino County, seeking to assuage its residents' fears of venturing out in public, provided services that would allow voters to drop off a ballot without ever leaving their vehicle. *See* Ex. 23. Pinal County was forced to relocate polling locations because of facility closures due to the virus. *See* Ex. 24. Maricopa County, Arizona's most populous voting jurisdiction, sought to send mail ballots to all its voters to encourage them to vote by mail out of concern that it would not have enough poll workers to staff polling locations because of COVID-19. *See* Ex. 25. That prediction was accurate. Maricopa was eventually forced to close nearly 80 polling locations just days before the election "after churches, nursing homes and others said they no-longer felt comfortable welcoming voters to cast ballots, some poll workers backed out and the county ran short on disinfecting supplies." Ex. 26.

The day after Arizona's PPE, the Secretary sent a letter to Arizona's legislative leaders, urgently calling out the need to prepare for the upcoming Primary and General Elections in light of the COVID-19 crisis. *See* Ex. 16.[1] Much like other state leaders around the country, the Secretary expressly requested the Arizona Legislature to authorize County Boards of Supervisors to conduct all-mail elections for the 2020 Primary and General Elections to "ensure that voters can safely vote despite an ongoing public health emergency." *Id.*; *see also* Ex. 27 (Nevada's Secretary of State announced state would

---

[1] Secretary Hobb's letter was addressed to Senate President Karen Fann, Democratic Leader David Bradley, House Speaker Rusty Bowers, and Democratic Leader Charlene Fernandez.

5

effectively cancel in-person voting and mail ballots to all voters for upcoming June election); Ex. 28 (Georgia's Secretary of State announced state will mail absentee ballot request forms to all of Georgia's nearly 7 million registered voters as a "major push to encourage voting by mail during the coronavirus pandemic"); Ex. 29 (explaining states like Arizona which already rely heavily on voting by mail, such as Hawaii, Alaska, and Wyoming, "will no longer offer *any* in-person voting" for their upcoming primaries); Ex. 30 (Wisconsin's Governor called on state legislature to implement all mail voting for the upcoming elections); Ex. 31 (Vermont passed temporary law allowing Secretary of State to mail every voter a mail ballot and extend deadline for clerks to receive ballots for upcoming elections); Ex. 32 (North Carolina State Board of Elections asked Governor and Legislature to significantly expand access to absentee voting for upcoming elections). In making her request, the Secretary urged that changes to upcoming elections be implemented "in a way that ensures that those without access to regular mail delivery are not disenfranchised." Ex. 16; *see also* Ex. 33 (election law experts discussing the importance of increasing access to voting by mail in a way that does not disenfranchise minority voters).

The Secretary's request to move to all mail voting and ensure that voting by mail is fully accessible to all Arizona voters aligns not only with actions that other states are taking, but also responds to voter behavior during this crisis.[2] More importantly, however, the Secretary's request to ensure that voters without access to regular mail delivery are not disenfranchised recognizes the critical challenges that voters in Arizona already face and will increasingly face as they are forced to change their methods of voting during this pandemic. In particular, many minority and rural voters in Arizona live in communities in which access to mail delivery is infrequent or unreliable and where mail can take up to ten days to be delivered. *See* Doc. 22 at 3, 8, 10. These voters face an increased risk of having their ballot arrive after the Election Day Receipt Deadline.

Indeed, as more Arizonans vote by mail during this crisis, they are more likely to be

---

[2] Arizona reported an increase in voting by mail during its March 2020 PPE, with 90 percent of all ballots being cast via mail. *See* Ex. 1 at 2.

disenfranchised by the Election Day Receipt Deadline for several reasons. *First*, many individuals who will be voting by mail in the upcoming General Election are typically in-person voters and, as a result, differ in some important respects from people who typically vote by mail. *See* Ex. 1. "People who vote in precincts on Election Day tend to decide for whom they will vote later in the process, typically at the end of the campaign. Because these voters are 'late deciders' they are more likely to cast a vote by mail at the end of the process with only a few days to go or even on Election Day." *Id* at 4-5. In-person voters also generally tend to be newer voters, and in this instance, most of the individuals entering the vote-by-mail system as a result of COVID-19 will be voting by mail for the first time. *Id*. These voters are more likely to be unfamiliar with the procedures for absentee ballots and more likely to be impacted by rules like the Election Day Receipt Deadline, which are contrary to their customary practices of ensuring that documents are postmarked, not received, by a date certain. *Id*. All of these differences are more likely to result in a voter mailing their ballot closer to the time of the election, increasingly running the risk they will be entirely disenfranchised because of the Election Day Receipt Deadline. *Id.*

*Second*, the anticipated increase in voting by mail is likely to come at the same time as USPS is facing a budgetary crisis due to COVID-19 that threatens to shutter the entire agency by this summer. *See* Ex. 1, Ex. 36. This has grave implications for Arizonans' right to vote. In the past, when USPS has faced budget crises, it has responded by cutting hundreds of processing centers. *See* Ex. 37. Moving forward, it is likely that USPS will need to make cuts—whether to routes, processing centers, or staff—any of which is likely to increase mail processing delays. Such delays will be acutely felt in Arizona, which already faces slow mail service and delays in the best of times. *See* Doc. 22 at 8-9, 12. Rural counties in Arizona, for example, already recommend mailing a ballot ten days in advance of an election, *see id.* at 5, and even Maricopa County recommends at least six days, *see id.* at 10. This timeline is likely to be pushed back even further under the strain of USPS budget cuts, an increased number of mail ballots which need to be processed, and COVID-19. Nor are these concerns speculative. In the past two weeks, USPS struggled to deliver mail ballots

to voters in Wisconsin, with some mail ballots being delayed, and others not arriving at all. *See* Ex. 35. In response, both of Wisconsin's Senators wrote to the Inspector General of the USPS seeking an investigation into "absentee ballots not being delivered in a timely manner" and the USPS's failure to deliver in this regard. *Id.*

As the number of mail delays grow and the number of voters voting by mail increases, the number of Arizonans disenfranchised by the Election Day Receipt Deadline will also increase. If Arizona were to move to an all vote by mail system—not even accounting for potential mail delays, but assuming conservatively the same rate of late mail ballots as in past elections—it is anticipated that almost 4,000 Arizonans will be disenfranchised in the 2020 General Election. Ex. 1 at 7, 10. Moreover, as noted, it is highly unlikely that the rate would stay the same. Rather, because the increase in voters who vote by mail will come from voters who are more likely to send in their mail ballot on or near Election Day, the actual rate of late ballots and the total number of individuals disenfranchised due to the Election Day Receipt Deadline is likely to be far higher. *Id.* at 4-6.[3] In the March 2020 PPE, just as the coronavirus crisis was beginning, Arizona experienced a four-fold increase in the rate of late mail ballots from the 2018 General Election, with 2,698 voters being disenfranchised in just six counties. *Id.* If ballots are rejected for arriving late at that same rate in the 2020 General Election and Arizona voters vote by mail at the similar rate they did in the March PPE, approximately 18,700 voters will be disenfranchised as a result of the Election Day Receipt Deadline. *Id.* at 7, 9-10.

Moreover, as results from the March 2020 PPE indicate, Latino and Hispanic voters, Native American voters, and rural voters are at increasing risk for disenfranchisement under the Election Day Receipt Deadline. In the March 2020 PPE, Santa Cruz County rejected 32.1 mail ballots per 1,000 mail ballots cast for arriving late, Pinal County rejected 15.8 mail ballots per 1,000 mail ballots cast for arriving late, and Yavapai County rejected 12.1

---

[3] Importantly, the estimated number of additional disenfranchised voters cited above accounts only for the possibility that the number of voters voting by mail increases, not that the *rate* of late ballots will increase. Those figures are thus conservative estimates of the number of voters who are disenfranchised if voting by mail increases in Arizona.

8

mail ballots per 1,000 mail ballots cast for arriving late. *See id.* at 7-8. These counties' rejection rates for late ballots vastly exceeded Maricopa County's rate of mail ballots rejected for being late in the PPE—5.7 mail ballots per 1,000 mail ballots cast—which is still four times higher than the rate of late rejections that Maricopa County saw in the 2018 General Election. *Id*. at 7.

In sum, as the COVID-19 crisis continues, the risk that more and more voters will be completely disenfranchised as a result of the Election Day Receipt Deadline will only become more severe, and the necessity of enjoining the law more pressing to ensure that all eligible Arizona voters are able to have their votes counted.

### III.   ARGUMENT

While the Court can and should grant Plaintiffs' Motion for a Preliminary Injunction based on the evidence submitted in support of that motion, the COVID-19 crisis has made it far more likely that countless more Arizona voters will be disenfranchised by the Election Day Receipt Deadline and intensified the need for immediate relief. Against the backdrop of this public health crisis, Plaintiffs are increasingly likely to succeed on the merits of their claims and the remaining factors for a preliminary injunction tip sharply in their favor.

*First,* the COVID-19 crisis increases the magnitude of the burden on Arizona voters' voting rights as well as the likelihood that they will be deprived of their liberty interest—*i.e.*, completely disenfranchised—by the Election Day Receipt Deadline. Even prior to the crisis, Arizona election officials recommended mailing a ballot back anywhere from six to ten days before the election, depending on the voter's location within the state. *See* Doc. 22 at 10. Nevertheless, in the past several election cycles, tens of thousands of ballots—even when mailed in that time frame—did not arrive by the Election Day Receipt Deadline and were rejected by the State, disenfranchising those voters. *See id.* In light of the COVID-19 crisis, it is certain that more voters will utilize mail ballots due either to social distancing or state policies and that postal delays are likely to increase. *See supra* at 4-7. In the March 2020 PPE, Arizona saw a marked increase in mail voting and a corresponding four-fold jump in the rate of ballots rejected for arriving late. *Supra* at 8. As a consequence,

thousands—and likely tens of thousands—more voters will be disenfranchised by the Election Day Receipt Deadline, despite doing everything that the state has instructed them to do in order to exercise their right to vote. Ex. 1 at 8-9.

Moreover, Arizona voters who traditionally vote in person, and who will now be effectively required to vote by mail (either by law or due to public health concerns), are particularly likely to be disenfranchised by the Election Day Receipt Deadline. *See supra* at 7. These voters are both (1) much less likely to know that they need to send in a ballot six to ten days, or even more, before Election Day for their ballot to be counted, and (2) are traditionally "late deciders," and thus more likely to send in their ballots closer to or on Election Day in the first place. *See id.*

Likewise, these factors are likely to be compounded by mail delays that will make it even more difficult for voters to determine precisely when they should mail their ballot so that it arrives by the Election Day Receipt Deadline. Given the time that it already takes for mail ballots to arrive—anywhere from six to ten days—and the resultant delays in ballots arriving due to increasing stress on USPS, including projected severe budget shortfalls, *see id.*, even small changes in mail delivery have the potential for large impacts on the number of ballots which arrive after the Election Day Receipt Deadline, and thus, are not counted.

Finally, while the Secretary has argued in this litigation that the state's provision of in-person voting opportunities is a mitigating factor to the disenfranchisement caused by the Election Day Receipt Deadline, *see* Doc. 30 at 2, 10-11, it is evident that voters will be unable to or unlikely to utilize in-person voting under the current circumstances, as shelter in place orders continue and voters continue to practice social distancing. Moreover, even if polling locations are technically open, it is increasingly doubtful that the full array of polling sites previously available to voters will be in operation. Even in the early stages of this crisis Maricopa County was forced to close approximately a third of its polling locations for the PPE. *See supra* at 5. As fewer polling locations are open, voting in person or dropping off a ballot in person becomes significantly more difficult as polling locations will be further from voters. And the same factors that already make voting in person or dropping

off a ballot in person an unrealistic option for many voters—a lack of reliable transportation or lack of resources to get to the polls, among many other factors—are likely to be exacerbated by this increasing public health (and now economic) crisis. *See* Doc. 22 at 7, 8 (explaining that a lack of reliable transportation, funds, or childcare often prohibit lower-income voters or minority voters from voting in person). Similarly, it is also likely that lines and wait times will grow longer due to social distancing practices and staffing shortages, *see* Ex. 20 and Ex. 34,[4] and that many voters—particularly Arizona's minority voters—will not have the time or resources to wait to vote. *See* Doc. 22 at 2, 7. Thus, the Election Day Receipt Deadline will exact an even greater burden on Arizona's voters under the current circumstances.

*Second,* the remaining preliminary injunction factors cut even more sharply in Plaintiffs' favor. Disenfranchisement is unquestionably irreparable harm, *see* Doc. 22 at 21, and the current crisis makes disenfranchisement more likely for an increasing number of Arizona voters. As Plaintiffs have demonstrated, at a minimum approximately 600 to 1,400 more voters will be disenfranchised in the upcoming 2020 General Election due to the Election Day Receipt Deadline than in past elections and, more likely, up to 20,847 more voters are likely to be disenfranchised. Ex. 1 at 6-7. Moreover, as voting by mail becomes the only legal or practical option for Arizona voters to exercise their right to vote, organizational Plaintiffs Priorities USA and Voto Latino Foundation will have to divert more resources towards educating Arizona voters about the substantial need to cast their ballots up to ten days (or more) before the election, a task that may be even more challenging in these times as a substantial number of Arizona voters will be voting by mail for the first time and are otherwise unaware of this requirement.

The balance of the equities and the public interest also increasingly favor a preliminary injunction. Most notably, the Election Day Receipt Deadline for mail ballots

---

[4] For example, earlier this month, voters in Texas and California waited in lines that were several hours long, in part because polling locations were severely understaffed when many poll workers canceled in light of coronavirus concerns.

1  contributes to public health risks. If any Arizona voters forget or are unable to put their
2  ballot in the mail six to ten days before the election, their only option will be to vote in
3  person or to leave their home to turn their ballot in in person—a decision that could risk
4  their health and contribute to the community spread of COVID-19. Plaintiffs' attachments
5  show that the risk of substantial danger to the public health of engaging in such activity is
6  substantial, imminent, and ongoing. *See* Ex. 2: Ex.14; Ex. 17.

7  Just this past month, a federal court in Wisconsin extended the deadline for the
8  receipt of absentee ballots because voters were at risk of being disenfranchised by
9  Wisconsin's Election Day Receipt Deadline in light of the current public health crisis. *See*
10  *Democratic National Comm. et al.*, 2020 WL 1638374, at *5, *12, n.14 (explaining that
11  "[the state] cannot enforce laws that, even due to circumstances out of its control, impose
12  unconstitutional burdens on voters"). The court concluded that "the state's general interest
13  in the absentee receipt deadline is not so compelling as to overcome the burden faced by
14  voters who, through no fault of their own, will be disenfranchised by the enforcement of
15  the law." *Id.* at *17. The order to extend the absentee ballot return deadline was affirmed
16  by the Seventh Circuit. *See* Order, *Democratic Nat'l Comm. v. Republican Nat'l Comm.,*
17  No. 20-1538 (7th Cir. Apr. 3, 2020), ECF No. 30. A few days later, the United States
18  Supreme Court—evaluating the extension under the same *Anderson-Burdick*
19  framework—allowed the later receipt deadline to stand provided that the absentee ballots
20  were *postmarked* by Election Day, even though Wisconsin law, like Arizona's, provided
21  that mail ballots must be *received* by Election Day in order to be counted. *See Republican*
22  *Nat'l Comm.*, 2020 WL 1672702, at *2. That is precisely the relief that Plaintiffs seek here.

23  Secretary Hobbs was right when she recognized that a mail voting system must be
24  implemented in a way to ensure that voters are not disenfranchised. *See id.* The Election
25  Day Receipt Deadline already disenfranchises thousands of voters in Arizona and will
26  disenfranchise far more in the current crisis. This Court can prevent that from happening by
27  ordering the state to accept mail ballots that are cast on or before Election Day and received
28  within a reasonable period of time after Election Day.

**CONCLUSION**

For these reasons, and the reasons submitted along with Plaintiffs' original Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, Plaintiffs respectfully request that this Court issue a preliminary injunction as set forth in the Plaintiffs' previously submitted proposed order.

Dated: April 14, 2020

*s/* Amanda R. Callais
Alexis E. Danneman (# 030478)
Sarah R. Gonski (# 032567)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

Marc E. Elias*
John Devaney*
Amanda R. Callais*
K'Shaani O. Smith*
Zachary J. Newkirk*
Christina A. Ford*
**PERKINS COIE LLP**
700 Thirteenth Street NW, Suite 800
Washington, D.C. 20005-3960

*Admitted pro hac vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 14, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.

*s/ Michelle DePass*

14